[This decision has been published in *Ohio Official Reports* at 94 Ohio St.3d 340.]

THE STATE OF OHIO, APPELLEE, *v*. TWYFORD, APPELLANT.

[Cite as *State v. Twyford*, 2002-Ohio-894.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(Nos. 98-2360 and 95-2379–Submitted October 2, 2001–Decided March 6, 2002.)

APPEAL from the Court of Appeals for Jefferson County, No. 93-J-13.

———————————

DOUGLAS, J.

{¶ 1} In the early evening hours of September 23, 1992, Athena Cash was walking in a rural area in Jefferson County, Ohio. After traversing the crest of a hill, Cash noticed an object floating in an old strip-mining pond. Although it appeared to be in the shape of a human body, Cash was uncertain whether the object was, in fact, human. Cash subsequently summoned her boyfriend to view the object, and he concluded that the object was a human body. As a result, the couple contacted local law enforcement authorities.

{¶ 2} Law enforcement personnel, including Jefferson County Sheriff Fred Abdalla, responded to the scene and found parts of a skull and flesh on the ground. Some seventy-four feet away, the sheriff saw a body lying on its back in the body of water. On the shore, the sheriff also found blood, a pair of glasses, a baseball cap, and six shell casings fired from a .30-06-caliber rifle.

{¶ 3} While the body was floating in the pond, Sheriff Abdalla observed that it appeared "as if the head was cut off" and also noticed that "the hands were severed from the body." Once the body was removed from the water, it was determined that part of the face was still attached but that the skull was missing. Abdalla also discovered that the victim had been shot in the back. At the scene, Dr. John Metcalf, the Jefferson County Coroner, observed the same injuries. In addition, Dr. Metcalf found a pocket calendar diary inside the victim's shirt pocket.

The victim's name, Richard Franks, as well as a Windham, Ohio address, was written in the diary.

{¶ 4} On September 24, 1992, after contacting the Windham Police Department and receiving information that Franks had been missing for two days, Sheriff Abdalla traveled to the village of Windham in Portage County, Ohio. Prior to Sheriff Abdalla's arrival, Windham Chief of Police Thomas Denvir decided to place Franks's apartment under surveillance. Chief Denvir had discovered that Daniel Eikelberry lived with Franks, and while surveilling the apartment, Chief Denvir observed Eikelberry and Raymond A. Twyford III, appellant, in an automobile belonging to Joyce Sonny, appellant's girlfriend.

{¶ 5} Sheriff Abdalla arrived in Windham and at approximately 4:50 p.m. met local police officials, including Chief Denvir. Around 5:30 p.m. that same afternoon, while Sheriff Abdalla and Chief Denvir waited outside Franks's apartment for a warrant to enter the premises, appellant, accompanied by Eikelberry and Terri Sonny, Joyce's daughter, again drove by in Joyce Sonny's car. Appellant lived with Joyce Sonny and her daughters, Christina, age eighteen, and Terri, age thirteen, in Windham.

{¶ 6} At that time, and at Sheriff Abdalla's request, Chief Denvir stopped the car to talk with Eikelberry about his missing roommate, Franks. As appellant got out of Joyce's 1975 Chrysler sedan, Abdalla noticed "two survival knives, a hatchet and a small * * * hand saw" in the car. Appellant, who was not detained, waited outside Franks's house while Abdalla questioned Eikelberry at the police station.

{¶ 7} After interviewing Eikelberry, Sheriff Abdalla arrested appellant at around 6:25 p.m. for the murder of Richard Franks and advised appellant of his *Miranda* rights. After declining to be interviewed, appellant was taken to the Windham Police Department and held while police continued to question Eikelberry. At around 7:15 p.m., appellant on his own initiative indicated that he

would like to speak to Sheriff Abdalla and told him, "[S]heriff, I want to talk to you now, I'll tell you anything you want to know." Sheriff Abdalla, however, did not talk to appellant right away. Around 8:30 p.m., Abdalla again advised appellant of his *Miranda* rights, and appellant acknowledged and waived those rights, both orally and in writing.

{¶ 8} Appellant told Sheriff Abdalla and Chief Denvir that he lived with Joyce Sonny and her two daughters, Christina and Terri. On Saturday, September 19, two days prior to the murder, Eikelberry told appellant that Franks had raped Christina. After learning this, appellant said that he was very angry and that every time he thought of Franks or saw him he "saw red and started to shake."

{¶ 9} Appellant told Sheriff Abdalla that after learning of the rape, he and Eikelberry decided to kill Franks. The two of them drove around with Franks on Sunday evening, September 20. Appellant said, however, that he and Eikelberry could not find a suitable place to kill Franks. On Monday evening, September 21, on the pretext that they were going deer hunting, appellant, Eikelberry, and Franks drove to Jefferson County, arriving at around 1:00 or 2:00 a.m., September 22. Appellant was familiar with the area and had suggested this as the locale for the killing.

{¶ 10} According to appellant, he and Eikelberry told Franks to hold a flashlight, look for deer, and "hold the light in the eye of the deer," and appellant and Eikelberry would shoot the deer. Instead, as Franks walked off and was ten to twelve feet away, appellant shot him in the back with a .30-06-caliber rifle. After he fell down, Franks was still "gurgling," and Eikelberry shot Franks in the head with a .22 caliber pistol.

{¶ 11} Appellant and Eikelberry then repeatedly shot Franks in the head with the rifle and also shot his hands. Appellant also "took the wallet from Mr. Franks" and handed it to Eikelberry, and Eikelberry removed the hunting license from Franks's jacket. "[A]fter they [Eikelberry and appellant] had cut [Franks's]

hands off, they took the hands and put them in a * * * cowboy boot and * * * put some rocks in the boot to weigh it down and * * * [ran] the extension cord * * * around the boot." They shot Franks several times "to disfigure him so he couldn't be recognizable." Then "they both [dragged] the body * * * to the embankment * * * [and] shoved the body over the bank."

{¶ 12} Appellant further said that after leaving the scene of the murder, Eikelberry threw the boot containing Franks's hands into Yellow Creek (some eighteen miles away). On September 25, divers recovered the boot (which contained the hands) from Yellow Creek where appellant reported that it had been thrown.

{¶ 13} After he orally confessed to the murder, appellant wrote out details in a three-page handwritten statement that he signed. Chief Denvir and Sheriff Abdalla witnessed appellant's statement.

{¶ 14} Based upon other information from appellant's confession, police recovered from behind a vent off Joyce Sonny's living room a loaded "high-powered" .30-06-caliber rifle and a .22 caliber handgun loaded with "hollow point" ammunition. Two knives were also found. Both guns were operable. A parole officer verified that appellant had previously been convicted of burglary and hence was "restricted from owning, possessing or using any type of firearm."

{¶ 15} The grand jury indicted appellant on five counts. Count One alleged aggravated murder with prior calculation and design in violation of R.C. 2903.01(A) and aggravated murder in the course of a kidnapping in violation of R.C. 2903.01(B). Count One of the indictment also charged appellant with an R.C. 2929.04(A)(7) death penalty specification for committing aggravated murder during the course of a kidnapping. Count Two alleged an aggravated murder with prior calculation and design in violation of R.C. 2903.01 and aggravated murder in the course of aggravated robbery in violation of R.C. 2903.01(B). Count Two also charged appellant with an R.C. 2929.04(A)(7) death penalty specification of

committing aggravated murder during the course of committing an aggravated robbery. Count Three alleged kidnapping, Count Four alleged aggravated robbery, and Count Five alleged that appellant had a weapon while under disability. Counts One through Four contained gun specifications. Counts Three and Four also contained specifications enhancing the penalty, and these alleged that appellant had previously been convicted of burglary.

{¶ 16} Prior to trial, appellant moved to suppress his confession. A hearing was held on the motion to suppress wherein appellant testified that his confession was an involuntarily coerced statement made under duress and threat by law enforcement officers. Appellant further alleged that his confession was made while he was under the influence of narcotics and alcohol. The trial court denied the motion to suppress.

{¶ 17} During his 1993 trial, appellant pled not guilty but otherwise did not seriously contest the charges and presented no evidence at the guilt phase. In addition to the foregoing evidence obtained from appellant's confession, the state presented the following evidence as part of its case in chief.

{¶ 18} A forensics expert concluded that cartridge casings found at the murder scene could have been fired from the rifle seized from Joyce's living room "based upon the breech and firing pin impressions." Police also dug two bullets from the ground at the crime scene. According to the same expert, those bullets could have been fired from the rifle, but no conclusive match was shown.

{¶ 19} Dr. Patrick Fardal, the pathologist who performed the autopsy, indicated that the victim had suffered "approximately six to eight gunshot wounds of his body including his head and hands." Dr. Fardal found a gunshot wound, "obviously a fatal injury," where the bullet had entered Franks's back, had gone through his spinal cord, and had caused paralysis below the waistline and "injuries to multiple abdominal organs" before it then exited his abdomen. Franks also had bullet wounds in his severed hands, and his head sustained "massive destruction of

his skull, the skin of his face and the intracranial contents." According to Dr. Fardal, Richard Franks "died solely and exclusively of gunshot wounds * * * and probably the most significant one was the one to the trunk first and then the ones to the head."

{¶ 20} The jury found appellant guilty of all counts as charged. However, the findings on specifications enhancing the penalty were reserved for the court. After a penalty hearing, the jury recommended death on each aggravated murder charge. The trial court sentenced appellant to death on each murder count and to prison for kidnapping, aggravated robbery, having a weapon while under disability, and the firearms specifications.

{¶ 21} In 1995, on the initial appeal, the court of appeals rejected appellant's three assignments of error and affirmed the trial court's judgment. *State v. Twyford* (Oct. 6, 1995), Jefferson App. No. 93-J-13, unreported, 1995 WL 591905. Appellant appealed to this court, and the case was fully briefed. Then in 1997, the court of appeals reopened the appeal on a *Murnahan* application alleging ineffective assistance of appellant's appellate counsel before that court. We stayed the matter before us and transferred the record to the court of appeals for consideration of appellant's claims.

{¶ 22} Following rebriefing, the court of appeals noted the peculiar manner in which Counts One and Two were charged. *State v. Twyford* (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported. Namely, Count One charged felony murder with kidnapping as the underlying felony, and the R.C. 2929.04(A)(7) specification listed only kidnapping. In the Count Two felony murder charge, aggravated robbery was identified as the underlying felony, and the R.C. 2929.04(A)(7) death specification listed only aggravated robbery. The court also indicated that it had to merge the two murder counts, since a single death occurred. See, *e.g.*, *State v. Huertas* (1990), 51 Ohio St.3d 22, 28, 553 N.E.2d 1058, 1066.

{¶ 23} Accordingly, the court of appeals held that it could "consider only one of the two R.C. 2929.04(A)(7) specifications of which appellant was found guilty. Specifically, * * * [it] consider[ed only] the R.C. 2929.04(A)(7) specification which was contained in the first felony-murder count."[1] Thus, the court of appeals sustained the death penalty only on the basis of Count One and the R.C. 2929.04(A)(7) specification related to the kidnapping. In all other respects, the court of appeals affirmed the trial court's judgment and the death penalty. Appellant now appeals to this court as a matter of right, and the entire case has been rebriefed.

{¶ 24} Appellant presents thirteen propositions of law for our consideration. (See Appendix, below.) We have considered each of appellant's propositions of law and have reviewed the penalty of death for appropriateness and proportionality. Upon review, and for the reasons that follow, we uphold appellant's convictions and sentences, including the sentence of death.

I

{¶ 25} We have held that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. We continue to adhere to that position today. We have carefully considered all of the propositions of law and allegations of error and have thoroughly reviewed the record in its entirety. Many of the issues raised by appellant have been addressed and rejected by this court under analogous circumstances in a number of our prior cases. Therefore, these issues require little, if any, discussion. Additionally, many of appellant's arguments have been waived. Upon careful review of the record and the governing law, we fail to detect any errors requiring reversal of appellant's convictions and death sentence. We have found nothing in the record or in the arguments advanced by appellant that would

---

1. Appellant's counsel incorrectly asserts that the court of appeals affirmed the death sentence only for the aggravated robbery death penalty specification.

in any way undermine our confidence in the outcome of appellant's trial. Accordingly, we address and discuss in detail only those issues that merit detailed analysis.

II

Proposition of Law No. I

**{¶ 26}** In his first proposition of law, appellant alleges that he was denied his right to a fair and impartial jury and a reliable sentencing determination because the trial court denied him an opportunity to adequately voir dire prospective jurors on their death penalty views. In addressing questions concerning the proper scope and application of the voir dire process, we are guided by the following principles.

**{¶ 27}** The standard for determining whether a prospective juror may be excluded for cause due to his or her views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. (*Wainwright v. Witt* [1985], 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, followed.)" *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452. See, also, *State v. Williams* (1997), 79 Ohio St.3d 1, 5, 679 N.E.2d 646, 653.

**{¶ 28}** Additionally, "*voir dire* may constitute reversible error only upon a showing of abuse of discretion by the trial court." *Rogers,* 17 Ohio St.3d at 179, 17 OBR at 418, 478 N.E.2d at 990. Moreover, a trial court has " 'great latitude in deciding what questions should be asked on voir dire.' " *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, 300, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493, 505. See, also, *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274, 285 (issues raised in voir dire in criminal cases have long been held to be within the discretion of the trial judge).

**{¶ 29}** Appellant initially contends that the trial court permitted a "death qualifying" question that inadequately assessed potential jurors' views on capital punishment. We disagree.

**{¶ 30}** The death qualifying question generally posed by the prosecutor to a prospective juror in this matter was whether, "[i]n a proper case where the facts warrant it and the law permits it, could you join in signing a verdict form calling for the imposition of the death penalty?" According to appellant, this and similar questions served to identify only those individuals who were opposed to capital punishment in all cases and not those who would impose death in all instances.

**{¶ 31}** Appellant identifies the questioning of prospective jurors Carpenter and Buckmelter as evidence of error. However, both Carpenter and Buckmelter were excused for cause by the trial judge. The purpose of the voir dire is to empanel a fair and impartial jury. In this instance, the voir dire worked as designed. That is, through questioning from the prosecutor, defense counsel, and the trial judge, unqualified jurors are identified and excused. In essence, appellant's contention centers on the expediency with which the trial judge excused prospective jurors Carpenter and Buckmelter and not in the adequacy of the voir dire. In any event, Carpenter and Buckmelter clearly indicated a partiality towards imposing death in all cases of murder, and both were excused for cause. Therefore, we find no error.

**{¶ 32}** Appellant additionally argues that the trial court refused to allow defense counsel to ask any followup questions to the death-qualifying inquiry. In this instance, appellant relies heavily on *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. In *Morgan,* the United States Supreme Court considered whether a state trial court may refuse a defendant's request to question potential jurors during the *voir dire* of a capital case on whether they would automatically impose the death penalty upon conviction of the defendant. As this court has recognized, "[i]n *Morgan*, the United States Supreme Court held that the trial court, at an accused's request, must ask prospective jurors about their views

on capital punishment in an attempt to ascertain whether any of them would automatically vote for the death penalty regardless of the circumstances." *State v. Wilson,* 74 Ohio St.3d at 386, 659 N.E.2d at 300. Thus, "a capital defendant must be allowed to identify prospective jurors who have 'predetermined the terminating issue of [the] trial, that being whether to impose the death penalty.' " *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623, 637, quoting *Morgan v. Illinois*, 504 U.S. at 736, 112 S.Ct. at 2233, 119 L.Ed.2d at 507. Finally, the court in "*Morgan* held that answers to 'general questions of fairness or impartiality' cannot negate a statement by the prospective juror that he or she would automatically vote for death." *State v. Williams* (1997), 79 Ohio St.3d at 7, 679 N.E.2d at 654, quoting *Morgan*, 504 U.S. at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 506.

{¶ 33} Still, as already indicated, "a trial court has 'great latitude in deciding what questions should be asked on voir dire.' " *State v. Wilson*, 74 Ohio St.3d at 386, 659 N.E.2d at 300, quoting *Mu'Min v. Virginia,* 500 U.S. at 424, 111 S.Ct. at 1904, 114 L.Ed.2d at 505. Thus, for example, "*Morgan* does not require judges to allow individual voir dire on separate mitigating factors." *Wilson*, 74 Ohio St.3d at 386, 659 N.E.2d at 301. In *State v. Jones* (2001), 91 Ohio St.3d 335, 338, 744 N.E.2d 1163, 1171, we reaffirmed that "jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law." See, also, *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096, 1105; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304, 315; *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913, 920.

{¶ 34} In this case, the prosecutor and trial court appeared to be unaware of the underlying principle of *Morgan v. Illinois*, decided in June 1992, some nine months before this case was tried in March and April 1993. Thus, the trial court at times expressed the incorrect view that death qualification in voir dire concerned only whether a prospective juror could vote for the death penalty, not whether he

or she would automatically impose it. For example, when defense counsel argued that jurors had to "show a willingness to consider mitigating factors and to follow the law," the court responded, "This phase of * * * voir dire [concerns] whether or not they would be able to impose a death penalty." The court believed that death qualification "had nothing to do with mitigation."

{¶ 35} We disagree, however, with appellant's assessment that the trial court prevented appellant from engaging in any meaningful inquiry of the jurors' impartiality and thus their ability to act as triers of fact. Defense counsel objected for the record in regard to the trial court's apparent confusion regarding the teachings of *Morgan*. Arguing his objection, defense counsel asked that the record reflect that "we wish to question each one of these jurors individually about whether they will follow the law and consider other penalties as well as the death penalty." Further, defense counsel requested that they "be able to ask these [prospective jurors] will you follow the law, will you consider mitigating factors as well." After reviewing the transcript of proceedings of the voir dire, we find that defense counsel was, in fact, permitted to ask these and similar questions. Thus, in spite of the mistaken views of the prosecutor and trial court, the voir dire of prospective jurors indicates that appellant had an opportunity to discover those jurors who would automatically vote for the death penalty regardless of mitigation. The following is typical of the defense voir dire of sitting jurors.

"Mr. Hershey: Mrs. Harries, if the Court also instructed you that you are to consider three possible penalties, * * * a sentence of a minimum of twenty years to life, * * * a minimum of thirty years to life, * * * or the death penalty, do you feel you could follow that instruction?

"Mrs. Harries: Yes, I could.

"Mr. Hershey: And if the Judge instructs you that you are to consider the aggravating factors in this case as well as the mitigating factors * * * and that you

can only find the death penalty appropriate if the aggravating factors exceed the mitigating factors, do you also feel you can follow that instruction?

"Mrs. Harries:  Yes.

"Mr. Hershey:  Do you also feel that you can remain open minded about the penalties in this case?

"Mrs. Harries:  Yes, yes.

"Mr. Hershey:  We'll pass for cause."

{¶ 36} The key issue here concerns the opportunity of defense counsel to determine the competence of jurors who actually sat, and appellant fails to show any restrictions that prejudiced him as to those jurors.  For example, appellant cites the voir dire of sitting juror Griffo.  But the trial court did not improperly limit the voir dire of Griffo.  In response to brief questions by the state, Griffo agreed that she would follow instructions to consider three possible penalties.  Defense counsel was then permitted to question Griffo further without objection or interruption.

{¶ 37} The voir dire of still other sitting jurors demonstrated a fair opportunity to identify any juror who would automatically vote for the death penalty.  Other than Griffo, appellant does not complain about the voir dire of any sitting juror.  Nor did he challenge for cause those who sat as jurors.

{¶ 38} In fact, at the start of the penalty phase, the trial court again voir dired the jury to ensure that jurors had no fixed view on the penalty:

"Court:  Ladies and Gentlemen, * * * I would like to know at this time if any of you have now formed such a fixed opinion on what the sentence should be in this case or have so closed your mind that you could not hear and fairly consider evidence favorable to the defendant which might cause you to conclude that the death penalty is not appropriate in this case.  First I'll ask if you understand my question.  If any of you don't, raise your hand.  (No response.)

"Court:  Not hearing any response I take it that you have not formed such a fixed opinion on what the sentence should be in this case or have so closed your

12

mind that you could not hear and fairly consider evidence favorable to the defendant which might cause you to conclude that the death penalty is not appropriate in this case. So I take it that's your state of mind at this time.

"Now, * * * [could you] fairly consider the evidence which the State might present in an effort to convince you that the death penalty is appropriate in this case? If you have any questions as to that * * * let us know now.

"I take it then that you are in a frame of mind that you could fairly consider the evidence which the State might present in an effort to convince you that the death penalty is appropriate in this case."

{¶ 39} Appellant complains about the voir dire of prospective juror DeLaurentis. However, DeLaurentis never sat as a juror because defense counsel peremptorily excused him. Moreover, the trial court did not restrict the defense voir dire of DeLaurentis. DeLaurentis agreed to follow the trial court's instructions and consider the three options as to available penalties. When asked if he could consider "mitigating factors," DeLaurentis stated that he did not understand those. The court explained that "[m]itigating in that sense would mean to lessen the impact of the penalty." DeLaurentis agreed with defense counsel that he could "keep an open mind and follow the Court's instructions as to all the elements of this case." Defense counsel did not challenge DeLaurentis for cause or ask to question him further.

{¶ 40} Still, the trial court came dangerously close, at the prosecutor's urging, to improperly restricting the voir dire. The trial court could have readily explained the concept of mitigation. Jurors can be told, for example, that mitigating factors can relate to the nature and circumstances of the offense or the history, character, and background of the accused, his age, or other factors known to be relevant. See, *e.g., State v. Getsy* (1998), 84 Ohio St.3d 180, 200, 702 N.E.2d 866, 886. The trial court can easily do this while avoiding inquiry about specific

mitigating factors as proscribed in *State v. Jones*, 91 Ohio St.3d at 338, 744 N.E.2d at 1171.

{¶ 41} Moreover, contrary to his argument, appellant is required to show that his jury was tainted in order for his sentence to be vacated. In its discussion of *Ross v. Oklahoma* (1988), 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80, the *Morgan* court makes clear that constitutional error will arise in this instance only when the trial court permits an obviously unqualified juror to sit on the jury that invokes the death penalty and defense counsel objected to the trial court's failure to remove that juror for cause. *Morgan,* 504 U.S. at 728-729, 112 S.Ct. at 2229, 119 L.Ed.2d at 502. Appellant has not demonstrated any restrictions on the voir dire of sitting jurors in this case that precluded counsel from exposing "faults that would render a juror ineligible. * * * *Morgan* imposes no further requirements on voir dire." *State v. Wilson*, 74 Ohio St.3d at 386, 659 N.E.2d at 301.

{¶ 42} Based on the foregoing, we find that the jury herein consisted of a panel of fair and impartial jurors. Accordingly, Proposition of Law No. I is rejected.

### III

### Proposition of Law No. II

{¶ 43} In his second proposition of law, appellant contends that the trial court erroneously instructed the jury regarding the factors to consider in recommending punishment. Initially, we note that appellant did not request different penalty instructions or object to those given at trial. Appellant's "failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." (Citation omitted.) *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. The trial court's penalty instructions did not rise to the level of plain error.

**{¶ 44}** Appellant first contends that the trial court erred by failing to instruct the jury that only one aggravating circumstance could be weighed against the evidence of mitigation on each individual count of aggravated murder. According to appellant, the result was that the jury grouped the aggravating circumstances from both counts and weighed them against appellant's single set of mitigation evidence.

**{¶ 45}** The court in *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus, specified, "When a capital defendant is convicted of more than one count of aggravated murder, the penalty for each individual count must be assessed separately. Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count."

**{¶ 46}** Despite appellant's contention, we find that the trial court's instructions satisfied the dictates of *Cooey.* The trial court correctly instructed the jury on the single aggravating circumstance in each separate count. The court instructed the jury that "[t]he verdicts in each count and their respective specifications to each count constitute separate and distinct matters." Further, the court instructed the jury that it "must consider each verdict on each count and the specifications to each count and the evidence applicable to each count separately and you must state your decision and finding to each count uninfluenced by your verdict on the other count. You shall consider the evidence in each charge fairly and carefully."

**{¶ 47}** The trial court did make references, at various times, to "aggravating circumstances" in its instructions. For instance, the trial court indicated that the state "has the burden of proving beyond a reasonable doubt that the aggravating circumstances of which the Defendant * * * was found guilty outweigh the mitigating factors before you may return a sentence of death" and also that "the aggravating circumstance or circumstances is precisely set out in specification number one to Count One, to-wit: that [defendant] was the principal offender in the

commission of the aggravated murder * * * while * * * committing kidnapping." However, we find that these and such similar references by the trial court were not equivalent to an instruction to weigh the separate aggravating circumstances together. The court did not mislead the jury into multiplying or grouping the aggravating circumstances. See, *e.g.*, *State v. Palmer* (1997), 80 Ohio St.3d 543, 573-574, 687 N.E.2d 685, 710-711. Here, the jury returned separate verdicts for each aggravated murder count, and each verdict form referred precisely to the single specification in each count. Thus, the instructions complied with paragraph three of the syllabus in *Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895.

{¶ 48} Second, appellant argues that the court "told the jury that the quantity of aggravating circumstances was relevant in its deliberations," and, as a result, the jury understood that the number of aggravating circumstances was an important consideration in its determination of the appropriate penalty. However, our review of the record reveals that the trial court emphasized just the opposite to the jury. The court instructed the jurors that "[i]t is the quality of the evidence that must be given primary consideration" and further noted that "[i]t *is not* the quantity of the aggravating circumstances versus the quantity of the mitigating factors which is to be the basis of your decision. The quality or importance of the mitigating factors and the aggravating circumstances must also be considered." (Emphasis added.) Such an instruction involves no prejudicial error. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 348, 703 N.E.2d 1251, 1266.

{¶ 49} Third, appellant argues that when a defendant is convicted of two counts of aggravated murder for the killing of a single victim, the trial court should require the state to elect to proceed on a single murder count before beginning the penalty phase. However, the court's failure to merge the two counts at sentencing "represents a 'procedural' error that is 'harmless beyond a reasonable doubt.' " *State v. O'Neal* (2000), 87 Ohio St.3d 402, 415, 721 N.E.2d 73, 87, quoting *State v. Moore* (1998), 81 Ohio St.3d 22, 39, 689 N.E.2d 1, 17. Thus, we find no error

here in the jury's consideration of two aggravated murder counts for a single victim. *State v. Woodard* (1993), 68 Ohio St.3d 70, 78-79, 623 N.E.2d 75, 81; *State v. Waddy* (1992), 63 Ohio St.3d 424, 447, 588 N.E.2d 819, 836. Moreover, and in any event, the court of appeals mooted this issue when it upheld the death penalty, after independently reassessing the sentence, solely on the basis of Count One of the indictment and the R.C. 2929.04(A)(7) specification relating to kidnapping.

{¶ 50} Fourth, appellant avers that the instructions and verdict forms allowed the jury to improperly weigh both prior calculation and design and his principal offender status to determine the penalty. See *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746. Appellant is incorrect. In fact, the indictment, the trial and penalty instructions, and the jury's findings as to the death specifications all followed the statutory language set forth in R.C. 2929.04(A)(7) and specified alternatives, *i.e.*, that appellant "was the principal offender" in the murder, "*or, if not*," committed the murder with prior calculation and design. (Emphasis added.) This court has repeatedly declined to find prejudicial error from similar instructional language. See, *e.g.*, *State v. O'Neal*, 87 Ohio St.3d at 415-416, 721 N.E.2d at 87-88; *State v. Goodwin*, 84 Ohio St.3d at 349, 703 N.E.2d at 1266-1267; *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242, 248.

{¶ 51} Fifth, appellant argues that this court's independent sentence reassessment cannot cure penalty instructional errors. However, our independent reassessment of the sentence can, in fact, cure penalty-phase instructional errors. See, *e.g.*, *State v. Goodwin*, 84 Ohio St.3d at 348-349, 703 N.E.2d at 1266; *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70, 83. Moreover, appellant's failure to object to the trial court's instructions waived all but plain error, and no plain error occurred.

{¶ 52} Finally, appellant complains that the trial court's sentencing opinion improperly multiplied the single R.C. 2929.04(A)(7) death specification into multiple aggravating circumstances. The language of the trial court's opinion does

not support that claim. Further, as already indicated, the court of appeals independently reassessed the death penalty based on a single aggravated murder count and death penalty specification, which moots that issue. Furthermore, our review can also cure such an error. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131.

**{¶ 53}** Accordingly, Proposition of Law No. II is not well taken.[2]

IV

Proposition of Law No. III

**{¶ 54}** In Proposition of Law No. III, appellant argues that the trial court wrongfully excluded mitigating evidence related to his ability to peacefully coexist with other inmates. Appellant notes that during the penalty phase, the trial court did not allow a defense psychologist, Dr. Donald Gordon, to answer the question: "If [Twyford] would be returned to prison do you feel he poses a threat to another inmate?"

**{¶ 55}** Despite the state's arguments, the question was relevant. R.C. 2929.04(C) grants "great latitude" to an accused in the presentation of mitigating evidence during death penalty hearings. A " 'sentencer, in all but the rarest kind of capital case, [must] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record * * * that the defendant proffers as a basis for a sentence less than death.' " (Emphasis *sic*.) *State v. Jenkins* (1984), 15 Ohio St.3d 164, 189, 15 OBR 311, 332, 473 N.E.2d 264, 288, quoting *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973, 990. See, also, *Parker v. Dugger* (1991), 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (court erred in not considering nonstatutory mitigating evidence); *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (error to exclude

---

2. Appellant's complaint in this proposition of law regarding the prosecutor's arguing "non-statutory aggravating circumstances to the jury and repeatedly referr[ing] to the aggravating circumstances in the plural" is also raised in Proposition of Law Number VI. It will be discussed and addressed within the context of appellant's prosecutorial misconduct claims raised therein.

evidence of defendant's adjustment to incarceration); see, *e.g., State v. Smith* (1997), 80 Ohio St.3d 89, 121-122, 684 N.E.2d 668, 696. Thus, the trial court erred when it sustained the state's objection. Dr. Gordon was qualified by education and familiarity with the case to express an opinion on appellant's likely adjustment to prison, and the answer to such a question was relevant.

{¶ 56} Nonetheless, no prejudicial error exists. First, for error to occur because evidence is excluded "(1) the exclusion of such evidence must affect a substantial right of the party, *and* (2) the substance of the excluded evidence was made known * * * by proffer *or* was apparent from the context within which questions were asked." (Emphasis *sic.*) Evid.R. 103(A)(2); *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, syllabus. Accord *State v. Mitts* (1998), 81 Ohio St.3d 223, 227, 690 N.E.2d 522, 527; *State v. Davie* (1997), 80 Ohio St.3d 311, 327, 686 N.E.2d 245, 261.

{¶ 57} The court can ordinarily eliminate the effect of any exclusion of evidence by independently reassessing the penalty in light of the excluded evidence. See *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710, 721. At trial, appellant never made a proffer of exactly what Dr. Gordon would say. In most instances, the lack of a proffer would preclude the court from determining the significance of the excluded testimony.

{¶ 58} However, here appellant presented other evidence fully reflecting Dr. Gordon's views without interference. For instance, Dr. Gordon testified that appellant did not have violent tendencies except to protect children who were threatened. If an adult "was trying to intimidate him, * * * he would be aggressive back but not violent. * * * [H]e would do what he had to do to get them to back off. But he wouldn't be cruel or violent." Dr. Gordon discussed at length the nature of appellant's past crimes, his past incarcerations, the lack of violence in his background, and his sense of compassion for children and his need to protect them.

In view of Dr. Gordon's testimony, sustaining the state's objection was harmless error. Hence, Proposition of Law No. III lacks merit.

V

Proposition of Law No. IV

{¶ 59} Appellant's arguments concerning the proportionality and appropriateness of his death sentence are addressed in our discussion in Part XIV.

VI

Proposition of Law No. V

{¶ 60} In Proposition of Law No. V, appellant challenges the sufficiency of the evidence necessary to support a conviction for aggravated robbery (Count Four), which served as the underlying felony for aggravated murder in Count Two of the indictment. Based upon his claim of insufficient evidence, appellant contends that his convictions for aggravated murder and attached capital specifications must be set aside.

{¶ 61} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 62} Appellant argues that the evidence does not establish that he stole anything. However, the jury could reasonably find that he and Eikelberry stole Franks's wallet and hunting license. In his confession statement, appellant admits, "I whent (*sic*) through his [Franks's] pockets and took his walet (*sic*) out and gave it to Danny [Eikelberry.] [H]e stuck it in his pocket! Danny [then] * * * ripped [Franks's hunting tag] off[.]" Crime scene witnesses verified that they discovered Franks's identity through a pocket diary, and none mentioned seeing a wallet or hunting license.

**{¶ 63}** Appellant also argues that no robbery occurred because Franks was already dead when the items were stolen. This court has consistently rejected arguments that no robbery occurred because the murder victim was already dead at the time of the theft. See, *e.g.*, *State v. Biros* (1997), 78 Ohio St.3d 426, 450, 678 N.E.2d 891, 911; *State v. Rojas* (1992), 64 Ohio St.3d 131, 139, 592 N.E.2d 1376, 1384; *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510, 516.

**{¶ 64}** Moreover, in this case, the death penalty does not hinge upon finding appellant guilty of the offense of aggravated robbery. The court of appeals affirmed the death penalty only on the basis of Count One, the felony-murder involving kidnapping and the R.C. 2929.04(A)(7) specification charging murder during a kidnapping. Thus, the sufficiency of evidence as to Count Two, felony murder, is a moot issue. Any sufficiency of evidence claim as to aggravated robbery would affect only Count Four, the aggravated robbery count.

**{¶ 65}** Therefore, Proposition of Law No. V is not well taken.

VII

Proposition of Law No. VI

**{¶ 66}** In Proposition of Law No. VI, appellant raises several instances of alleged prosecutorial misconduct. The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15, 14 OBR 317, 318-319, 470 N.E.2d 883, 885-886. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87.

**{¶ 67}** Appellant first contends that the prosecutor remarked on appellant's decision not to testify. In the guilt phase of appellant's trial, the prosecutor's closing argument consisted, in part, of the following:

"As you know, opening statements, arguments of Counsel are not evidence. Mr. Vukelic [defense counsel] repeated [in his closing statement] what he told you in opening statement. What he [defense counsel] told you and what I told you is [*sic*] not evidence.

"Athena Cash was a witness, Florence Logan, Gerry Mroczkowski, Mr. Roberts from BCI, Greg Helmick, Lieutenant Noble, Chief Denvir, Doctor Metcalf, Doctor Fardal, Mr. Haggarty, Sheriff. Those are witnesses.

"Now he [defense counsel] went through again repeating his opening statement. He [defense counsel] reminded you how he told you how Raymond— how Raymond Twyford was about the summer of 1992. He told you that. Did you hear anything from the witness stand?

"And he explained to you in his opening statement how Raymond cared for these children. Nice statement. He [defense counsel] didn't take the stand. Did you hear anything from the witness stand?

"He [defense counsel] told you how there was cooking and cleaning and cared for and home life and father image. And did you hear any of that from the witness stand?

"You hold us [defense counsel and prosecutor] to whether we've proven what * * * we were required to prove. That's why statements of Counsel are not evidence, only the ones that come from the witness stand."

{¶ 68} We note, initially, that appellant failed to object at trial regarding this particular conduct of the prosecutor. Thus, appellant has waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. See, also, Crim.R. 52(B).

{¶ 69} Clearly, it is improper for a prosecutor to comment on the defendant's failure to testify. *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; *State v. Cooper* (1977), 52 Ohio St.2d 163, 173, 6 O.O.3d 377, 382-383, 370 N.E.2d 725, 732-733. In order to determine whether there was

a violation of defendant's Fifth Amendment rights, we must consider " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " (Emphasis deleted.) *State v. Webb* (1994), 70 Ohio St.3d 325, 328, 638 N.E.2d 1023, 1028, quoting *Knowles v. United States* (C.A.10, 1955), 224 F.2d 168, 170.

{¶ 70} Arguably, the comments by the prosecutor in this instance can be read as an impermissible inference of guilt regarding the defendant's decision not to testify, and we in no way condone such tactics. However, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 439; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068, 1078. In this light, we do not find that the prosecutor acted improperly. Counsel is entitled to latitude in closing arguments as to what the evidence has shown. *State v. Smith,* 80 Ohio St.3d at 111, 684 N.E.2d at 689; *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082, 1102. The prosecutor merely pointed out differences between what defense counsel said in their opening statement versus what the evidence proved. The prosecutor did not refer to appellant's choice not to testify or even to matters solely within appellant's knowledge. For instance, Sonny or her daughters could have testified about appellant's household assistance. Cf. *State v. Fears* (1999), 86 Ohio St.3d 329, 336, 715 N.E.2d 136, 145-146; *State v. Webb*, 70 Ohio St.3d at 328-329, 638 N.E.2d at 1028-1029.

{¶ 71} Even assuming *arguendo* that the prosecutor's comments were improper, such comments neither materially prejudiced appellant nor denied him a fair trial. Appellant presented no evidence at the trial phase, and evidence of his guilt was compelling. In addition, the court instructed the jury not to consider appellant's decision not to testify "for any purpose," and "[a] jury is presumed to

follow the instructions given to it by the trial judge." *Loza,* 71 Ohio St.3d at 75, 641 N.E.2d at 1100.

{¶ 72} Appellant raises several additional contentions regarding prosecutorial misconduct. First, appellant contends that the prosecution erred by mentioning certain objects (*i.e.,* two knives, a saw, and a hatchet) in its opening statement and by presenting evidence about these objects. Second, appellant complains about certain comments by the prosecutor during the guilt phase, specifically the prosecutor's commenting that evidence would show that appellant "terrorized this victim," that he "restrained" him, "mutilated the body," or that appellant "confessed to the murder and mutilation" of Franks, and that Franks, who lay on the ground after being shot, "was brutalized and * * * dehumanized." Third, appellant complains that the prosecutor argued facts as nonstatutory aggravating circumstances and "argued for the death penalty based on the 'heinous, atrocious, or cruel' nature of the crime." Fourth, appellant argues that the prosecutor shifted the burden of proof to an incorrect standard by referring to whether mitigating factors outweighed aggravating circumstances. Fifth, appellant argues that the prosecutor's argument improperly suggested that the jury should individually weigh each mitigating factor against the aggravating circumstances. Finally, appellant asserts that the prosecutor discounted the role of mitigating evidence when he indicated that such evidence did not excuse or justify the crime.

{¶ 73} We have reviewed these arguments in their entirety, and none is supported by a fair and impartial review of the record. Trial counsel failed to object to each and every one of these purported acts of prosecutorial misconduct and thus have waived all but plain error.[3] We find that "[n]either alone nor in the aggregate

---

3. In regard to the physical evidence, *e.g.,* two knives, a saw, and a hatchet, found in Joyce Sonny's car when appellant was first stopped, we note that, although appellant's trial counsel failed to raise an objection to references or testimony about these objects or to their being marked as state's exhibits, counsel did object to their being admitted as evidence at the close of the state's case and

did these [asserted] errors have an arguable effect on the outcome of the trial." *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925. In sum, appellant received a fair trial, and misconduct by the prosecutor did not permeate the trial.

**{¶ 74}** Accordingly, we reject appellant's Proposition of Law No. VI. *State v. Landrum*, 53 Ohio St.3d at 111, 559 N.E.2d at 717; *State v. Johnson* (1989), 46 Ohio St.3d 96, 102, 545 N.E.2d 636, 642.

VIII

Proposition of Law No. VII

**{¶ 75}** In his seventh proposition of law, appellant argues that he was denied a fair trial and a fair sentencing determination because the trial court erroneously admitted gruesome and cumulative photographs. According to appellant, these photographs served no purpose other than to invoke the sympathy of the jurors toward the victim and inflame the jury's emotions against appellant. We disagree.

**{¶ 76}** Pursuant to Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum,* 53 Ohio St.3d at 121, 559 N.E.2d at 726. "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. See, also, *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267, 273-274. For the following reasons, we find that the trial court did not abuse its discretion.

**{¶ 77}** Appellant refers specifically to state's exhibits 8, 9, 14, 15, 16, 24, 26, 27, and 28. However, appellant made no objection at trial to exhibits 9 and 24

---

the exhibits were not admitted. We further note that appellant's trial counsel was able to cross-examine Sheriff Abdalla regarding these items.

and hence can complain only of plain error as to those exhibits. *State v. Taylor* (1997), 78 Ohio St.3d 15, 26, 676 N.E.2d 82, 93. Exhibit 9, a photo of Franks's baseball cap, purportedly shows brain tissue, but, if so, it is not noticeable. Exhibit 24, a nongruesome side view of the cowboy boot, does not display the hands inside. Thus, no plain error resulted from admitting exhibits 9 and 24.

{¶ 78} At trial, appellant objected to the remaining exhibits that he now challenges. However, no error occurred. These photos portrayed Franks's body in relation to his surroundings and illustrated the testimony of Sheriff Abdalla, the coroner, and others who saw the crime scene. Exhibits 8, 14, 15, 27, and 28, for example, depicted the wounds inflicted upon Franks and helped to prove the killer's intent and the lack of accident or mistake. See *State v. Goodwin,* 84 Ohio St.3d at 342, 703 N.E.2d at 1262; *State v. Mason* (1998), 82 Ohio St.3d 144, 158-159, 694 N.E.2d 932, 949. These photos also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042, 1058.

{¶ 79} The photos were limited in number, noncumulative, and each photograph had substantial probative value and relevance. After the defense objected, the trial court excluded from evidence the most gruesome photograph, exhibit 16. After a defense objection, the state did not offer into evidence twenty-seven autopsy photographs. In other cases involving arguably more gruesome photographs, the court has found no abuse of discretion. See, *e.g.*, *State v. Smith,* 80 Ohio St.3d at 108-109, 684 N.E.2d at 687-688; *State v. Biros*, 78 Ohio St.3d at 443-444, 678 N.E.2d at 907-908.

{¶ 80} Even if the trial court did err in admitting these photographs, any prejudice was harmless in view of the compelling evidence of appellant's guilt. As to the penalty phase of appellant's trial, the trial court did not err in allowing these photographs into evidence. *State v. DePew* (1988), 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542, 551-552. Moreover, this court, by its independent reassessment

of the sentence, can minimize any improper impact on the sentence arising from the admittance of these photographs. *State v. Davie*, 80 Ohio St.3d at 318, 686 N.E.2d at 255; *State v. Lundgren*, 73 Ohio St.3d at 486, 653 N.E.2d at 318.

{¶ 81} Thus, Proposition of Law No. VII is denied.

IX

Proposition of Law No. VIII

{¶ 82} Appellant argues in his eighth proposition of law that the trial court erred by permitting evidence of a prior criminal act committed by appellant, thereby depriving him of a fair trial and sentencing determination. We find no merit to appellant's contentions.

{¶ 83} In Count Five of the indictment, appellant was charged with knowingly possessing a weapon while under disability in violation of R.C. 2923.14 because he had previously been convicted of a felony of violence: burglary. To prove an essential element of that offense, to which appellant had pled not guilty, the state was required to prove this felony conviction. The state did so with an appropriate record of the conviction and testimony from a parole officer. See, *e.g.*, *State v. Smith* (1990), 68 Ohio App.3d 692, 695-96, 589 N.E.2d 454, 457.

{¶ 84} Appellant contends that his counsel preserved this issue by asking the trial judge to determine the existence of this conviction at sentencing. Appellant, however, is mistaken. The pretrial motion to which counsel refers concerned an entirely different issue, one relating to penalty enhancement specifications. The kidnapping (Count Three) and aggravated robbery (Count Four) charges against appellant included penalty enhancement specifications. Before trial, counsel did request that the court, "pursuant to Ohio Revised Code Section 2941.142 to determine the existence of prior felony convictions at the sentencing hearing and that the jury not be permitted to consider the evidence of prior convictions."

**{¶ 85}** But R.C. 2941.142, since repealed, applied only to situations where a penalty for a felony offense under R.C. 2929.11 was enhanced because of the existence of a prior felony conviction.[4] The court in fact followed R.C. 2941.142 in this case. At appellant's request, the trial court did not submit those penalty enhancement specifications to the jury, and the jury made no findings regarding them. Instead, the trial court, as requested, referred to those penalty enhancement specifications only at sentencing.

**{¶ 86}** Former R.C. 2941.142 does not apply to Count Five because the prior conviction was a direct element of the principal offense charged. The state was entitled to prove that element of Count Five as it did. Moreover, contrary to appellant's assertions, defense counsel never objected to this evidence, requested a limiting instruction, or objected to the lack of a limiting instruction. Having failed to object to the evidence or instructions, appellant waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. See, also, Crim.R. 30(A). No error occurred.

**{¶ 87}** Accordingly, appellant's Proposition of Law No. VIII lacks merit.

X

---

4. Former R.C. 2941.142 provided:

"Imposition of a term of actual incarceration upon an offender pursuant to division (B)(1)(b), (2)(b), or (3)(b) of section 2929.11 of the Revised Code because the offender has previously been convicted of or pleaded guilty to any aggravated felony of the first, second, or third degree, aggravated murder or murder, or any offense set forth in any existing or former law of this state, any other state, or the United States that is substantially equivalent to any aggravated felony of the first, second, or third degree or to aggravated murder or murder is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender has previously been convicted of or pleaded guilty to such an offense. Such a specification shall be stated at the end of the body of the indictment, count, or information * * *.

"* * *

"A certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar is sufficient to prove the prior conviction. If an indictment, count in an indictment, or information that charges a defendant with an aggravated felony contains such a specification, the defendant may request that the trial judge, in a case tried by a jury, determine the existence of the specification at the sentencing hearing." Am.Sub.S.B. No. 210, 140 Ohio Laws, Part I, 583, 602-603, repealed by Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, 7138, effective July 1, 1996.

Proposition of Law No. IX

{¶ 88} In Proposition of Law No. IX, appellant argues that the trial court erred when it failed to suppress his confession. Appellant contends that his *Miranda* waiver was invalid because it was obtained unknowingly and also because his confession was the product of coercion.

{¶ 89} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155. The same considerations apply to whether appellant understood and voluntarily waived his *Miranda* rights. *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208, 1226.

{¶ 90} First, appellant claims that his confession was not made knowingly and intelligently because he was intoxicated by alcohol and under the influence of drugs at the time that he was arrested and agreed to waive his rights. Second, appellant claims that his confession was coerced because police officers threatened to arrest Joyce Sonny and her children unless he cooperated.

{¶ 91} Appellant's claim that he was intoxicated with alcohol and under the influence of drugs is contradicted by the fact that appellant wrote out a legible and coherent three-page confession in which he recalled days-old events and articulated, in detail, the motivation, planning, and execution of Franks's murder. No evidence was submitted to suggest that police officers physically abused appellant, threatened him, or made any promises during questioning. Furthermore, appellant was twenty-nine years old when questioned and was experienced with the criminal justice system.

**{¶ 92}** Moreover, the evidence indicates that appellant was verbally advised of his *Miranda* rights on two separate occasions. Appellant signed a waiver of rights form, acknowledging that he understood his rights and that he knowingly and voluntarily waived those rights. In addition, we note that there was little incentive to coerce appellant, since at the time of the alleged coercion, Sheriff Abdalla had already obtained a statement from Eikelberry implicating appellant in Franks's murder. In short, there is no credible evidence that appellant's confession was coerced.

**{¶ 93}** In *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982, the court noted that "[a]t a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." In *State v. Keene* (1998), 81 Ohio St.3d 646, 656, 693 N.E.2d 246, 257, the court recognized the need to defer to a trial court's factual findings that are supported by the record. The record of appellant's suppression hearing contains ample evidence that appellant's confession was given knowingly, intelligently, and voluntarily. Therefore, we find that the trial court did not err in failing to suppress the confession.

**{¶ 94}** Accordingly, appellant's Proposition of Law No. IX lacks merit and is denied.

XI

Proposition of Law No. X

**{¶ 95}** Appellant contends that when a juror is excused after the rendering of the guilt phase verdict and replaced by an alternate juror prior to the start of the penalty phase, a capital defendant may not be sentenced to death. Appellant's tenth proposition of law is rejected on the authority of *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432, paragraphs two and three of the syllabus.

XII

Proposition of Law No. XI

**{¶ 96}** In his eleventh proposition, appellant argues that trial counsel were ineffective because they elicited evidence about appellant's sexual misconduct with Joyce Sonny's daughters, Christina and Terri. In cross-examining Sheriff Abdalla, appellant's trial counsel attempted to develop the basic defense theme that appellant killed Franks because appellant believed that Franks had raped Christina Sonny. However, Sheriff Abdalla had interviewed Joyce and her daughters, who reportedly had told Abdalla about appellant's alleged sexual activities with both Sonny daughters.

**{¶ 97}** Appellant complains that counsel should never have elicited such reported evidence of misconduct. We agree that trial counsel used poor judgment in using open-ended questions while cross-examining Abdalla. Counsel's cross-examination elicited serious uncharged misconduct regarding appellant's sexual activity with Joyce's children. In response to the defense claim, the state contended that appellant acted more from jealousy than revenge because he had been sexually active with both daughters. Such evidence undermined the defense theory that appellant killed Franks simply to punish Franks for raping Christina and to protect Joyce's children.

**{¶ 98}** The court of appeals indicated that given the defense strategy, testimony that appellant was involved in sexual activity with Joyce's children was inevitable. That rationale assumes that, first, the state intended to introduce such evidence, and, second, such evidence was admissible. The court of appeals described it as counsel's "difficult dilemma."

**{¶ 99}** Yet, the prosecution did not seek to introduce evidence at the guilt phase that appellant had sex with Joyce's children. Nor did the prosecution call either of Joyce's children to attempt to prove this point, although the state had asked Sheriff Abdalla questions on redirect after appellant's counsel had introduced the subject. The evidence on this point at trial consisted only of otherwise inadmissible hearsay statements to Abdalla. Moreover, the defense

introduced no evidence during the guilt phase, and thus the state was unable to introduce such misconduct through cross-examination or rebuttal evidence. Thus, it was totally unnecessary for the defense to introduce such harmful testimony of appellant's reported misconduct at the guilt phase.

{¶ 100} Reversal of convictions for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 101} Eliciting testimony regarding appellant's reported misconduct with Joyce's children through open-ended questioning of one of the state's most important witnesses was inexplicable. Moreover, counsel could have waited until the penalty phase before assessing whether such testimony was absolutely necessary. In this regard, the record does not show that either child was available and willing to testify or what their testimony would have been.

{¶ 102} Admittedly, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, *supra,* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. However, we find that counsel's open-ended cross-examination of Sheriff Abdalla represented deficient performance. No reasonable defense trial tactics or strategy would support eliciting hearsay evidence that appellant had sex with these children. This evidence lacked both relevance and any benefit for appellant at the guilt phase. Under the circumstances, counsel's performance fell "below an objective standard of reasonable representation." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 103} However, even if the cross-examination reflected deficient performance, appellant fails to establish prejudice under the *Strickland* test. The

jury would inevitably have found appellant guilty as charged. First, forensic evidence linked the shell casings at the murder scene to the rifle found in Joyce Sonny's living room. Second, appellant wrote out a confession admitting to robbing, kidnapping, and killing Franks, and he also displayed detailed knowledge of how the crime was planned and carried out. Third, counsel at trial conceded that appellant did not contest many of the facts and that appellant and Eikelberry had "killed Richard Franks."

{¶ 104} Moreover, any deficient performance at the guilt phase did not reasonably affect the penalty phase. As part of the defense penalty-phase strategy, appellant testified about his life and the events leading to the killing, including his motive. Appellant denied sexual activity with the daughters, explained away his prior admissions, and admitted that he had, indeed, put a "hickey" or "sucker bite" on Terri Sonny's neck. As a result, the state cross-examined appellant about his reason for killing Franks and delved into assertions about appellant's own sexual activity with the children.

{¶ 105} Finally, prejudice is not established, since disclosure of this evidence was probably inevitable at the penalty phase, given appellant's strong reliance on the claim that he killed Franks because Franks had raped Christina. Appellant has thus failed to show by "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Even if we found that evidence of appellant's sexual activity with the children should never have been presented to the jury, the effect of this error can be corrected by our independent reassessment of the sentence. See, *e.g.*, *State v. Davie*, 80 Ohio St.3d at 322, 686 N.E.2d at 258; *State v. Landrum*, 53 Ohio St.3d at 115, 559 N.E.2d at 721.

{¶ 106} Appellant also argues in this proposition of law that his counsel should have further questioned prospective jurors in voir dire by asking more

questions on pretrial publicity, the presumption of innocence, and their status as relatives of crime victims. We have considered these instances of alleged ineffectiveness of trial counsel and find that appellant has failed to satisfy his burden of establishing ineffective assistance under the standards set forth in *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

XIII

Propositions of Law Nos. XII and XIII

{¶ 107} Appellant's challenge in Proposition of Law No. XII to the court's "reasonable doubt" instruction is summarily rejected. See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300, 316; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus. We also summarily reject appellant's contention, also raised in Proposition of Law No. XII, that the trial court erred in its instruction to the jury regarding appellant's purpose to commit the crime. See, *e.g.*, *State v. Stallings* (2000), 89 Ohio St.3d 280, 291, 731 N.E.2d 159, 172; *State v. Getsy*, 84 Ohio St.3d at 196, 702 N.E.2d at 883; *State v. Loza*, 71 Ohio St.3d at 81, 641 N.E.2d at 1104.

{¶ 108} We further summarily reject appellant's Proposition of Law No. XIII challenging the constitutionality of Ohio's death penalty statute. *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345, 357-358; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009, 1023; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. In addition, appellant has waived his international law challenge by not raising this claim before the trial court. *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus. In any event, we also summarily reject appellant's challenge based on international law. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484, 499; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643, 671.

XIV

{¶ 109} Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness and proportionality (also raised in appellant's Proposition of Law No. IV). For purposes of our independent review, we will consider only the single (merged) aggravating circumstance that was considered by the court of appeals in its own independent review of appellant's death sentence. Thus, we consider the R.C. 2929.04(A)(7) specification of the aggravating circumstance premised on kidnapping—*i.e.,* that appellant shot and killed Richard Franks during the course of a kidnapping—which appellant does not seriously dispute.

{¶ 110} In mitigation, testimony was received from three people: appellant, Dr. Donald Gordon, a psychology professor, and Charles Twyford, appellant's younger brother. Each testified concerning appellant's history, character, and background.

{¶ 111} Appellant testified that he was born on October 15, 1962, in Youngstown, Ohio. When he was an infant, his parents divorced. During this time, his father took appellant and his younger brother to live in Nevada. At around age six, appellant's grandparents returned him to Ohio, where he lived with his mother and stepfather. Appellant's stepfather frequently got drunk and beat appellant, his younger brother, and his mother. Appellant's biological father died when he was seven years old.

{¶ 112} When appellant was eight, his mother had a nervous breakdown, which the stepfather blamed on appellant. Appellant was subsequently sent to live with an aunt and uncle in Youngstown. While otherwise kind to appellant, the uncle also introduced appellant to alcohol and marijuana. Between the ages of nine and thirteen, appellant drank alcohol and used drugs. When he was thirteen, he intentionally shot himself in the head and lost his right eye as a result. During the rest of his teen years, he spent time in juvenile detention facilities.

{¶ 113} After he turned eighteen, appellant lived and worked in Ohio, Texas, Florida, and California, spending time in prison but also working in a variety of jobs. While in juvenile detention facilities and in prison, he tried to kill himself several times and was hospitalized as a result. After his last release from prison in 1992, his wife and stepdaughter refused to live with him. At that time, he was drinking heavily and using drugs.

{¶ 114} Appellant also testified that he did not like rapists or child molesters, having been raped in prison. Appellant noted that even before he met Joyce Sonny, Christina had already had a baby as a result of being raped, but Christina and Joyce had given the baby up for adoption. Appellant also indicated that he learned in prison that it did not help to complain to authorities.

{¶ 115} Appellant additionally acknowledged that Christina was "mentally disabled" but denied knowing that Richard Franks was similarly challenged. Appellant claimed that he got into fights or used violence only for self-defense or to defend women or children. Appellant denied that he was sexually active with either Terri or Christina but admitted that he once gave Terri a sucker bite on her neck to punish her.

{¶ 116} Dr. Donald Gordon, a psychology professor, testified that he interviewed appellant, gave him several tests, interviewed appellant's relatives, and looked at various documents. Dr. Gordon reiterated appellant's family history and upbringing, noting the severe mistreatment he suffered at the hands of his stepfather. According to Dr. Gordon, the abuse was so severe that finally, when appellant was fifteen, he told his stepfather that he would kill him if he ever beat up appellant's mother again. Dr. Gordon also testified that, as a youth, appellant frequently ran away and was suspended from school. From age seventeen to twenty-eight, appellant spent time in prison but also was able to gain employment when he was not incarcerated.

{¶ 117} Dr. Gordon indicated that appellant hated child molesters and rapists based on his experiences while incarcerated. In Dr. Gordon's opinion, appellant did not trust people and believed that they overlooked the welfare of children. Appellant felt that he had to be the protector of children, especially Christina and Terri Sonny. According to Dr. Gordon, appellant was not a violent person, and his prior offenses were property crimes, not crimes of violence. Moreover, Dr. Gordon testified that appellant believed that Franks would not be punished for raping Christina, just as the men who had raped him in prison had not been punished. Also, if appellant was caught for killing Franks, then no one would take care of Joyce's children, since she was not able to do so. Dr. Gordon believed that law enforcement officers may have unduly influenced or coerced the Sonny children's statements about appellant's reported sexual misconduct of them. In Dr. Gordon's view, appellant was compassionate and felt empathy for others. Finally, in Dr. Gordon's opinion, appellant was not a sociopath, nor did he have an antisocial personality disorder.

{¶ 118} Charles Twyford, appellant's younger brother, described life with their stepfather as frightening because their stepfather got drunk and beat up their mother and the children every week. According to Charles, as a youth, appellant ran away frequently because he did not want to be beaten. Charles did not believe that his brother was violent and indicated that his brother was arrested mostly for property crimes. Charles stated that appellant was good with children, including Terri and Christina, and children liked him.

{¶ 119} Appellant also gave his version of the events leading up to and including the murder of Richard Franks. In the summer of 1992, appellant met Joyce Sonny and her two daughters and moved in with them. According to appellant, he felt "very protective" of Joyce's daughters and helped care for them, especially after Joyce was hospitalized in August 1992 following a motorcycle accident.

**{¶ 120}** Richard Franks was a friend of Joyce's, but appellant never trusted him. When he was told that Franks had raped Christina, appellant was "shocked" and "couldn't see, * * * started shaking" and was very angry. According to appellant, Christina told appellant directly that Franks had raped her, and she was "very subdued, very quiet, [and] she didn't want to talk."

**{¶ 121}** Appellant further testified that he had told Eikelberry that he was "going to kill Richard Franks for raping [his] stepdaughter" because appellant "didn't think it would do any good to go to the police." He had to kill Franks to protect the family. Appellant reiterated the details of his confession but stressed that when he killed Franks, he was "still angry, * * * in a rage," drinking heavily, and taking pain medication. Appellant acknowledged that he never confronted Franks about his alleged rape of Christina, but he believed that Franks had raped Christina and had to be killed to protect the family.

**{¶ 122}** After independent assessment, we find that the evidence is sufficient to prove beyond a reasonable doubt the aggravating circumstance that appellant committed aggravated murder as the principal offender in the course of kidnapping Richard Franks. R.C. 2929.04(A)(7).

**{¶ 123}** As to mitigating factors, the nature and circumstances of the offense do not appear to be mitigating. Although appellant may have acted out of rage at the asserted rape of Christina, several factors tend to negate giving weight to his motive. First, appellant did not act quickly on some sudden impulse. By his own admission, nearly two days had elapsed between the time that appellant learned of the reported rape and when Franks was killed. Second, appellant never confronted Franks and, instead, just accepted as true the allegation that Christina was raped by Franks. Third, the viciousness of appellant's murder of Franks also tends to negate giving mitigating weight to the nature and circumstances of the offense.

{¶ 124} Upon review of the evidence, we find that appellant's history and background present some, but only modest, weight in mitigation. Admittedly, appellant suffered from a difficult upbringing with a stepfather who drank heavily and abused appellant, appellant's mother, and younger brother. However, appellant made clear choices in his early life to rebel against authority and to spend his time and effort on self-gratification through drugs, alcohol, and property crimes. Moreover, we find that appellant's character offers no weight in mitigation.

{¶ 125} Furthermore, the evidence does not support finding other statutory mitigating factors. Appellant's actions are removed in time from the alleged rape of Christina. This, of course, tends to negate the claim that Franks "induced" or "facilitated" the offense. See R.C. 2929.04(B)(1). This time delay also undercuts appellant's claim that he acted under "strong provocation." R.C. 2929.04(B)(2). Appellant did not suffer from any "mental disease or defect" as defined in R.C. 2929.04(B)(3). In addition, appellant's age of twenty-nine and his prior criminal history negate the application of R.C. 2929.04(B)(4) and (B)(5). His actions as a principal offender preclude applying the mitigating factor, guilt as an accessory, in R.C. 2929.04(B)(6). Finally, the record does not support finding other mitigating factors. R.C. 2929.04(B)(7).

{¶ 126} After weighing the aggravating circumstance against the mitigating evidence, we find that the aggravating circumstance of murder during a kidnapping outweighs the evidence presented in mitigation. Appellant admits to having planned a deliberate murder for revenge, acting as the judge, jury, and executioner of Richard Franks. According to his own testimony, appellant never confronted Franks and, instead, exacted the revenge that he wanted by shooting Franks in the back without any warning and then deliberately mutilating Franks's body.

{¶ 127} As a final matter, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously imposed the death sentence. We find that the death penalty imposed against appellant is neither

excessive nor disproportionate when compared with other aggravated murders involving kidnapping. *State v. Ballew* (1996), 76 Ohio St.3d 244, 667 N.E.2d 369; *State v. Joseph* (1995), 73 Ohio St.3d 450, 653 N.E.2d 285; *State v. Simko* (1994), 71 Ohio St.3d 483, 644 N.E.2d 345; *State v. Fox* (1994), 69 Ohio St.3d 183, 631 N.E.2d 124; *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464; *State v. Brewer* (1990), 48 Ohio St.3d 50, 549 N.E.2d 491; and *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267.

{¶ 128} Accordingly, for all of the foregoing reasons, we affirm the judgment of the court of appeals and uphold the sentence of death.

*Judgment affirmed.*

RESNICK and F.E. SWEENEY, JJ., concur.

COOK, J., concurs in judgment.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in part and dissent in part.

PFEIFER, J., dissents.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 129} I concur in the portion of the majority opinion affirming Twyford's convictions, but for the reasons that follow, I respectfully dissent from the analysis of Part XII of the opinion regarding ineffective assistance of counsel, and I would remand the cause to the trial court for a new sentencing hearing.

{¶ 130} I concur with the majority in its conclusion that there was overwhelming evidence of Twyford's guilt. Twyford made a voluntary, knowing, and detailed confession of his crimes, both orally and in writing. There was a myriad of forensic evidence supporting Twyford's convictions, including information that he gave police that led to the discovery of the victim's hands and the retrieval of two guns and two knives from the home in which Twyford resided. Moreover, at trial, Twyford did not dispute that he had committed the murders. In

fact, at trial, defense counsel conceded that Twyford did not contest many of the facts and that Twyford and an accomplice had "killed Richard Franks."

{¶ 131} However, rather than having killed Franks in cold blood, Twyford claimed that he killed Franks because he believed that Franks had raped Twyford's girlfriend's daughter, Christina. Yet, in cross-examining Sheriff Abdalla, defense counsel elicited evidence about Twyford's alleged sexual misconduct with his girlfriend's two daughters, Christina, age eighteen, and Terri, age thirteen. In cross-examining Sheriff Abdalla, defense counsel apparently had sought to advance the theory that Twyford killed Franks because Franks had raped Christina. But as the majority points out, counsel used poor judgment in using open-ended questions while cross-examining Sheriff Abdalla, and, in doing so, elicited evidence about Twyford's alleged sexual misconduct involving the two girls.

{¶ 132} Below is a portion of the transcript reflecting the cross-examination of Sheriff Abdalla. Counsel was inquiring as to why the children's mother, Twyford's girlfriend Joyce, did not look for the younger child, Terri, when she was absent from school:

"Q. Why didn't Joyce go look for her? Do you have any idea?

"A: To be honest with you?

"Q: Uh-huh.

"A: I don't think she could care less about her children.

"Q: Why would you say that?

"A: Why?

"Q: Yes.

"A: Because she was aware that Mr. Twyford was having sex with her eighteen year old and her thirteen year old and did nothing.

"Q: Now just a minute. Let's explore that a minute. How did you know she was aware of that?

"A: Cause she advised me of that."

{¶ 133} Even after eliciting this damning information about his own client, counsel persisted in cross-examining with more open-ended questions.

"Q: Okay. Anything else about Joyce that indicated to you she was less than a good mother?

"A: Sure. Number one, as I stated, that I don't think that she provided the—the medical treatment or mental treatment for her daughter that she should. I'm standing in a house and her thirteen year old daughter's got a large sucker bite over here that Mr. Twyford put on the child.

"Q: Now, how do you know that?

"A: Cause she told me.

"Q: Who did?

"A: The child.

"Q: Now did the child indicate anything else to you?

"A: Sure.

"Q: And what did she tell you?

"A: That Raymond Twyford took her to bed.

"Q: Now wait. Which child is this now?

"A: I'm talking about the thirteen year old. When I started to talk to the thirteen year old about Raymond's sexual advances on that child, the child started to open up. Okay. She started telling me what he was doing with her.

"* * *

"Q: Did you ask Christina if she had been raped?

"A: Yes.

"Q: Do you think she understands what the word raped means?

"A: I think if you sit down and try to explain it to her, she might understand it. She had sex with the victim. She had sex with this suspect.

"Q: Now, wait a minute. How do you know that?

"A: She told me."

{¶ 134} In response to this testimony from the guilt phase, as the majority notes, the state claimed that Twyford had acted more from jealousy than revenge because he had been sexually active with both daughters. The majority notes that counsel's continued cross-examination elicited serious uncharged misconduct about Twyford's sexual activity with his girlfriend's children, all in the form of hearsay that is inadmissible under the Rules of Evidence. The majority finds that this testimony undermined the defense theory that Twyford had killed Franks in order to punish Franks for raping Christina and to protect Joyce's children.

{¶ 135} In order for a conviction to be reversed on appeal for ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and, (2) that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. See *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 136} The majority concludes that counsel's open-ended cross-examination of Sheriff Abdalla represented deficient performance, thus satisfying the first prong of the *Strickland* test. However, the majority holds that Twyford failed to establish prejudice because the jury would inevitably have found Twyford guilty as charged. While I agree that there was overwhelming evidence of Twyford's guilt, I cannot agree with the majority's conclusion that any deficient performance at the guilt phase did not reasonably affect the *penalty phase*.

{¶ 137} At the penalty hearing, Twyford presented compelling evidence in mitigation. Twyford testified that his biological father was lost at sea when Twyford was seven years old and he had lived with his mother and stepfather, who frequently drank and beat him. After his mother had a nervous breakdown, he went to live with an aunt and uncle for three or four months. The uncle introduced him to alcohol and marijuana, which he began using at the age of nine. Twyford ran away whenever he was sent back to his mother and stepfather. At the age of

thirteen, Twyford intentionally shot himself in the head and lost his right eye. After his attempted suicide, the beatings by his stepfather resumed.

{¶ 138} Twyford was sent to a detention center for six months when he was fourteen but again was returned to the home of his mother and stepfather, where he was beaten; he ran away again. When he was arrested once more, he was sent to a more secure detention center for eighteen months. He has spent considerable time in both juvenile and adult detention facilities and has had a lifelong substance abuse problem. While in juvenile detention and prison, Twyford attempted suicide several times.

{¶ 139} Most compelling and most relevant to the case, Twyford testified that he was raped in prison and that prison authorities did nothing to stop it or punish those involved. In the opinion of expert psychologist Dr. Gordon, based on Twyford's past experiences, Twyford did not trust people and did not have faith in law enforcement authorities. Dr. Gordon testified that Twyford's early childhood set him up to believe that people do not protect children and that because of his bad experiences with his own mother, his ex-wife, and Joyce, Twyford developed the attitude that he had to protect Joyce's children. Dr. Gordon testified that Twyford believed that just as the men who had raped him in prison had not been punished, Franks would not be punished for raping Christina.

{¶ 140} Twyford testified that he knew that Christina had some mental handicaps and knew that she had been raped in the past and had had a child. Twyford testified that he believed that he had to be the protector of his girlfriend's two children. Twyford also testified that he believed that when a woman is raped, it is the woman who goes on trial and not the man. Twyford believed that there was a good chance that Franks would not be punished.

{¶ 141} Twyford denied that he was sexually active with the two girls but admitted that he had once playfully given the younger one a sucker bite on her neck in order to teach her a lesson after she had done the same to him. Moreover, Dr.

Gordon testified that he believed that law enforcement officers might have unduly influenced or coerced the girls' statements about Twyford's reported sexual activity with them.

**{¶ 142}** The majority holds that disclosure of the evidence regarding Twyford's alleged sexual misconduct was *probably inevitable* at the penalty phase, given Twyford's strong reliance on the claim that he had killed Franks because Franks had raped Christina. I disagree. In my view, there is no evidence to support this conclusion. The testimony of the witnesses was blatant hearsay and clearly inadmissible. The prosecution never put the mother, Joyce, or either child on the witness stand. Therefore, there is no way that this evidence could have been properly presented to a jury. In its hearsay form, there was no opportunity to cross-examine the alleged sources of the statements—the mother and the children—and no opportunity to test the credibility of the claims. These allegations dramatically altered the picture presented by the defense and, I believe, seriously impacted how the jury viewed mitigation.

**{¶ 143}** In my view, it is very probable that the evidence confused the jurors and led them to conclude that Twyford was worthy of the worst form of punishment that our system permits: death. It was almost inevitable that this piece of damning evidence would transform the defendant in the jury's eyes from a frustrated man seeking justice outside a system that had previously failed him to a pedophile who wanted to eliminate his competition.

**{¶ 144}** With all of the evidence of mitigation and without hearing this damning evidence that was permitted due to the deficiencies of Twyford's counsel, I believe that this jury would have chosen life imprisonment. Accordingly, I would find that Twyford's counsel's incompetence prejudiced his defense so as to deprive him of a fair trial. *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 145}** For these reasons, therefore, I concur as to the majority's affirmance of Twyford's convictions but respectfully dissent from the majority's

decision to uphold the sentence of death. I would instead vacate the sentence of death and remand the cause for rehearing pursuant to R.C. 2929.06(B), which provides for the trial court to impanel a new jury for a new mitigation and sentencing hearing in which this evidence would be excluded.

Moyer, C.J., concurs in the foregoing opinion.

_____

**PFEIFER, J., dissenting.**

{¶ 146} This case is another example of why the felony-murder rule is often inappropriate for determining which murderers are death-worthy. See *State v. Murphy* (2001), 91 Ohio St.3d 516, 561, 747 N.E.2d 765, 812 (Pfeifer, J., dissenting); *State v. Carter* (2000), 89 Ohio St.3d 593, 611, 734 N.E.2d 345, 360 (Pfeifer, J., concurring).

{¶ 147} Death penalty cases require courts to perform two general tasks. We must determine whether the defendant is the murderer. In this case, Twyford's culpability is manifest. Next, we must determine whether the defendant should be sentenced to death. In this case, the determination of death-worthiness turns on whether there was a kidnapping. See Crocker, Concepts of Culpability and Deathworthiness: Differentiating Between Guilt and Punishment in Death Penalty Cases (1997), 66 Fordham L.Rev. 21.

{¶ 148} When kidnapping is the felony undergirding a felony-murder death sentence, distinguishing guilt and punishment is especially difficult because the line between murder and kidnapping is blurry. In *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, syllabus, we stated:

"In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:

"(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain

46

separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions."

{¶ 149} As in *State v. Hartman* (2001), 93 Ohio St.3d 274, 754 N.E.2d 1150, the kidnapping here was incidental to the murder. Twyford used deception to kidnap the victim for the express purpose of killing him. Accordingly, there was no separate animus, and there was no significance independent of the other offense. Without a kidnapping, there is no felony murder; without felony murder, there is no death sentence. The majority deals with this important issue by stating that the appellant did not "seriously dispute" the kidnapping.

{¶ 150} An appellant's action or inaction does not obviate our duty to conduct an independent review into the appropriateness of the sentence of death. When the felony in a felony-murder death sentence is incidental to the murder, we as a court should find the death sentence inappropriate and reverse it. I dissent.

APPENDIX

*"Proposition of Law No. I:  Morgan v. Illinois,* 504 U.S. 719, [112 S.Ct. 2222] 119 L.Ed.2d 492 (1992), mandates that a capital defendant be permitted to voir dire potential jurors on their views of capital punishment, facts and circumstances of conviction and evidence of mitigating circumstances. Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

*"Proposition of Law No. II:*  When a trial court erroneously instructs a jury at the penalty phase regarding the factors to consider in recommending punishment and when it independently considers more than one valid aggravating circumstance, a capital defendant is denied the right to a fair trial, the right to a reliable sentencing determination, and the right to due process of law. Sixth, Eighth and Fourteenth

Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

"*Proposition of Law No. III:*  Where the trial court does not permit a witness to testify about capital defendant's ability to peacefully live in prison, the trial court diminishes the reliability of the jury's determination that death was the appropriate punishment, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

"*Proposition of Law No. IV:*  When the death sentence is excessive and disproportionate to the sentences in similar cases and when it is inappropriate, the death sentence must be vacated and a life sentence imposed.  Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

"*Proposition of Law No. V:*  The state failed to introduce sufficient evidence to prove all the elements of aggravated robbery beyond a reasonable doubt, and therefore, appellant was deprived of his right to due process of law under the Fourteenth Amendment of the United States Constitution as well as Article I, Section 16 of the Ohio Constitution.

"*Proposition of Law No. VI:*  Raymond Twyford's convictions must be reversed and his death sentence vacated because prosecutorial misconduct throughout all phases of the capital trial violated appellant's right to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution, and it deprived the sentencing determination of the reliability required by the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution.

"*Proposition of Law No. VII:*  A capital defendant is denied a fair trial and a reliable sentencing determination when gruesome and cumulative photographs are admitted into evidence.  Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

"*Proposition of Law No. VIII:* When the trial court permits evidence of prior criminal acts, it denies a capital defendant the right to a fair trial, an impartial jury, and to a reliable sentencing determination in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5 and 10 of the Ohio Constitution.

"*Proposition of Law No. IX:* The trial court erred when it failed to suppress Twyford's statement because the *Miranda* waiver was obtained unknowingly, and the confession was the product of coercion. The trial court's action denied Twyford his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 2, 9, 16, and 20 of the Ohio Constitution.

"*Proposition of Law No. X:* When a juror is replaced with an alternate juror between the guilt and penalty phases of a trial, a capital defendant may not be sentenced to death. Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 3, 5, 10, and 16 of the Ohio Constitution. Ohio Rev.Code Ann. Section 2929.03(d)(2) (Anderson 1993).

"*Proposition of Law No. XI:* Defense counsel's actions and omissions at Twyford's capital trial deprived him of the effective assistance of trial counsel as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

"*Proposition of Law No. XII:* A trial court denies a capital defendant the right to a fair trial and to due process of law when it erroneously instructs the jury during the trial and penalty phases of a capital case.

"*Proposition of Law No. XIII:* Ohio's death penalty law is unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev.Code Ann. Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, (Anderson 1996), do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Raymond Twyford."

———————————

*Bryan H. Felmet,* Jefferson County Prosecuting Attorney, and *Richard H. Ferro,* Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* Ohio Public Defender, *J. Joseph Bodine, Jr.,* and *Angela Greene,* Assistant Public Defenders, for appellant.

———————————