OPINION
{¶ 1} Defendant-appellant, Thomas G. Moody, appeals from his February 7, 2002 judgment of conviction for murder and felonious assault. Because this is the third appeal resulting from these charges, a review of the procedural background of this case is beneficial.
 {¶ 2} On December 12, 1997, appellant and his brother, Ronald Moody, were indicted on charges of murder with a firearm specification, in violation of R.C. 2903.02, felonious assault with a firearm specification, in violation of R.C. 2903.11, and having a weapon while under disability, in violation of R.C. 2923.13.
 {¶ 3} A joint trial against appellant and his brother began on September 10, 1998. Ronald Moody entered into a plea agreement after the first witness testified, and the trial continued against appellant. On September 22, 1998, the jury found appellant guilty of murder, felonious assault, and the firearm specifications. A nolle prosequi was entered on the weapon under disability count. Appellant was sentenced to a term of 15 years to life for murder plus a three-year firearm specification to be served consecutively to the murder count and eight years for felonious assault, to be served concurrently.
 {¶ 4} On October 23, 1998, appellant filed his notice of appeal raising three assignments of error. This court affirmed the judgment of conviction in a memorandum decision rendered on September 30, 1999. State v. Moody (Sept. 30, 1999), Franklin App. No. 98AP-1371. On December 29, 1999, appellant filed an application to reopen that was granted by this court on February 22, 2000.
 {¶ 5} On March 13, 2001, this court reversed appellant's conviction because of error in the jury instructions. State v. Moody (Mar. 13, 2001), Franklin App. No. 98AP-1371.
 {¶ 6} The first attempt to retry the case ended in a mistrial. The trial that is the subject of this appeal began on January 22, 2002.
 {¶ 7} The charges arose out of events that transpired on November 11, 1997. That afternoon, Ronald Moody got into an argument with a neighbor, Sylvester Harrington, about ownership of a pit bull puppy. The argument escalated into a fistfight between Harrington and Ronald Moody and appellant and Paul Holder. As Harrington and Holder began getting the better of the Moody brothers, Ronald Moody pulled a knife and the fight stopped. Ronald Moody drove off, and when he returned he had two handguns, one of which he gave to appellant.
 {¶ 8} Appellant was standing on his porch and Ronald Moody was standing on a set of steps leading to the sidewalk when a group of youths approached appellant's house. Some of the youths were friends and associates of Harrington and Holder. Words were exchanged, and Ronald Moody pulled out a gun and began shooting. Appellant also pulled his gun and began firing. Lamarr Newbern was wounded and Khadaffi Johnson was killed.
 {¶ 9} As in the first trial, witnesses offered conflicting testimony as to appellant's role in the shootings. Judith Johnson, Sylvester Harrington's mother, testified that she observed both the initial fistfight and the shooting. With respect to the shooting, Johnson testified that she saw Lamarr Newbern start to remove his jacket as if he were going to fight, when both brothers opened fire. She did not actually see the guns, but saw a cloud of smoke coming from each of their hands. Johnson testified that both brothers were taking direct aim, moving their hands trying to get a target.
 {¶ 10} Zachariah Brown, who was part of the group that approached appellant's home, testified that Ronald Moody shot Lamarr Newbern. Brown testified that he then began running, looked back, and saw appellant shoot Khadaffi Johnson. However, when the police interviewed Brown that evening, he never indicated that appellant shot Johnson.
 {¶ 11} Paul Holder, who was a friend to both of the victims, was unavailable for trial, but his testimony from the first trial was read into the record. Holder testified that Ronald Moody shot both Lamarr Newbern and Khadaffi Johnson.
 {¶ 12} After the shooting, appellant gave his gun to Ronald Moody who fled the scene. Appellant remained at his house where he was arrested by police. As he was being placed in a police cruiser, appellant stated that he had shot someone. Appellant later appeared on a local television news broadcast and made the following statement that was played to the jury:
 {¶ 13} "I told them point blank I shot him, I mean, I did. I shot him, and I'm sorry for the family, but these kids had a gun. He left me no choice. He showed a gun. I shot him, then I just turned the gun on the rest of the crowd and started shooting at all the rest of the people that were out there. So my brother wasn't there to do it. And they just cited him because of his long criminal history. And this is backwards. It's wrong." (Jan. 30, 2002 Tr., at 226.)
 {¶ 14} Appellant testified on his own behalf. He described the conflict over the puppy, and the fight that followed. Appellant stated that after his brother left, Sylvester Harrington and Paul Holder threatened to get him later, burn his house, and tear up his car. Appellant observed a person he later learned to be Lamarr Newbern pacing in front of his house with a cordless phone, making and receiving calls. Shortly thereafter, people began to show up, and Newbern would look over at appellant. Eventually, the group split up; half of them went into Newbern's house, and the other half went across the street where they were met my Paul Holder and Sylvester Harrington.
 {¶ 15} Ronald Moody returned on foot and handed appellant a gun. Appellant unzipped his coat and stuck the gun in his pants. Appellant stated that he went to his porch and stood in front of the door, and his brother walked to the edge of the steps that led down to the sidewalk. As the group of youths approached, Lamarr Newbern and Ronald Moody were staring at each other. Newbern and Ronald Moody exchanged words. Appellant testified that his brother first shot Khadaffi Johnson, then walked down the steps and shot Lamarr Newbern point blank in the chest. At that point, according to appellant, everyone then began to run. Appellant stated that his brother then went out into the street and continued shooting at people. Appellant testified that after Newbern was shot, appellant raised his gun in the air and emptied it. Appellant also testified that when he was arrested he told his nephew that he did it in order to protect his brother. Appellant said that he and his brother and sister came up with a plan in which Ronald Moody would turn himself in, and appellant would go to the news and say he (appellant) did it.
 {¶ 16} Following deliberations, on January 31, 2002, the jury returned guilty verdicts on all counts. On February 6, 2002, the trial court sentenced appellant to the same term the trial court imposed originally: 15 years to life for murder; a three-year firearm specification to be served consecutively to the murder count; and, eight years for felonious assault to be served concurrently.
 {¶ 17} On appeal, appellant has assigned the following as error:
 {¶ 18} "Assignment of error No. 1:
 {¶ 19} "The trial court erred and abused it discretion in ruling that Ronald Moody could not be called to the witness stand because he intended to assert the privilege against self-incrimination. Failing to order that the witness testify denied appellant due process, the right to present a defense, the effective assistance of counsel, the right of confrontation and the right to compulsory process in violation of the federal and state constitutions.
 {¶ 20} "Assignment of error No. 2:
 {¶ 21} "Appellant was denied a fair trial due to prosecutorial misconduct.
 {¶ 22} "A. In closing argument, the prosecutor referred to matters outside the evidence and impermissibly bolstered the testimony of a crucial prosecution witness.
 {¶ 23} "B. In closing argument, the prosecutor unfairly took advantage of an erroneous trial court ruling that could have been avoided and/or remedied by the prosecution."
 {¶ 24} In his first assignment of error, appellant asserts that the trial court erroneously determined that Ronald Moody had the right to exercise his Fifth Amendment privilege against self-incrimination, and consequently precluded the defense from calling Ronald Moody as a witness. Appellant maintains that his defense counsel should have been allowed to call Ronald Moody as a witness and if he refused to testify, the trial court should have compelled him to testify under threat of contempt. Appellant maintains that he was prejudiced by the trial court's ruling because he was denied the right to confront and question Ronald Moody.
 {¶ 25} During the retrial, appellant sought to call his brother, Ronald Moody, as a witness for the defense. Defense counsel expressed reservations about such a tactic, but stated that it was his client's wish. In relevant part, defense counsel stated:
 {¶ 26} "* * * Ronald Moody has been brought here through a subpoena that I sent to him. My client wants his brother to testify in his case. I was just informed when I talked to Ron Moody that he has nothing to say. He cannot remember anything.
 {¶ 27} "And I asked him specifically, I said, isn't it true you were charged with the murder of Khadaffi Johnson, and in the shooting of Lamarr Newbern, but yet you pled guilty to a weapon under disability? And his attitude was that that is public record, you don't need me to come in here and say that.
 {¶ 28} "First of all, your Honor, if the state does not object, my client is going to take the stand, I didn't know if the state would object to my client testifying that his brother was charged just like my client and did plead guilty to that charge, regardless of his involvement or what my client saw. If the state doesn't object, I may reconsider putting Ron Moody on the stand because I am, frankly, quite afraid of what he may say in front of this jury. I think — —
 {¶ 29} "THE COURT: I would be.
 {¶ 30} "MR. RIGG: To protect my client, it could either be a mistrial, which we start all over again, or it could go to the jury and he could burn him." (Jan. 24, 2002 Tr., at 225-226.)
 {¶ 31} Ronald Moody, through counsel, represented that, if called to testify, he would assert his Fifth Amendment privilege against self-incrimination and remain silent. Ronald Moody's counsel, who was representing him in a matter before the Ohio parole board, informed the trial court that his client's Fifth Amendment rights would not be recognized in prison administrative proceedings, and thus it was important that his client not even be called to the witness stand in the case as he could receive additional "flop" time from the parole board.
 {¶ 32} Ronald Moody was questioned outside the presence of the jury by defense counsel, his counsel, and the trial court, and he indicated that he did not intend to testify at his brother's trial. The state represented that it could not guarantee that Ronald Moody could not be charged in the future as a result of his testimony. The state was opposed to a grant of immunity. Defense counsel apparently acquiesced to the assertion that Ronald Moody could legitimately assert his Fifth Amendment privilege and refuse to testify. Defense counsel stated:
 {¶ 33} "* * * My client wants Ronald to be called to testify in this case even if he does take the Fifth Amendment. I understand that he cannot testify and will take the Fifth in front of the jury. However, my client wants him to do that, and he wants the jury to see his brother's demeanor, his attitude, and even if he does take the Fifth, he wants the jury to see that." (Jan. 28, 2002 Tr., at 7.)
 {¶ 34} The trial court found that it would be improper to call Ronald Moody because he would do nothing more than assert his Fifth Amendment privilege against self-incrimination. The trial court further stated that: "[i]f Ron were called he would be advised to take the Fifth Amendment because he may be placed in further jeopardy." (Jan. 28, 2002 Tr., at 8.) Appellant addressed the trial court personally and asserted that even if his brother did not testify, he wanted the jury to see his brother and draw their own conclusions based upon his attitude and demeanor. The trial court denied appellant's request, and defense counsel did not object to the trial court's implicit determination that Ronald Moody could assert his Fifth Amendment privilege against self-incrimination and, therefore, would not be called.
 {¶ 35} The Ohio Supreme Court has held that when a witness asserts a privilege against self-incrimination, a court may not rely upon the witness's claim alone, but has a duty to determine whether the witness's refusal to answer is justified. State v. Jackson (2001), 92 Ohio St.3d 436,447. A valid assertion exists where a witness has reasonable cause to apprehend a real danger of incrimination. United States v. Apfelbaum (1980), 445 U.S. 115, 127, 100 S.Ct. 948; In re Morganroth (C.A.6, 1983), 718 F.2d 161, 167. "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer * * * might be dangerous because injurious disclosure could result. * * *" Hoffman v. United States (1951), 341 U.S. 479, 486-487, 71 S.Ct. 814. The privilege extends to answers which would furnish a link in the chain of evidence, exposing the witness to criminal liability. Id. at 486; Blau v. United States (1950),340 U.S. 159, 71 S.Ct. 223; and State v. Landrum (1990), 53 Ohio St.3d 107,120-121.
 {¶ 36} Here, it is clear from the record that despite the prosecutor's assertion that he could not guarantee there would be no further prosecution, Ronald Moody was not in any real danger of criminal liability for the murder of Khadaffi Johnson or the felonious assault of Lamarr Newbern because he had pleaded guilty and begun serving his sentence on the weapon under disability charge arising out of the same incident. The fact that he had already pleaded guilty to a charge arising from the same incident as to which he was being questioned negated his invocation of the privilege. See State v. Dick (1971), 27 Ohio St.2d 162, paragraph two of the syllabus ("A witness may not rely on his Fifth Amendment privilege against self-incrimination where he has refused to be sworn and where he has pleaded guilty to a charge arising from the same incident as to which he was being questioned"). It is equally clear, however, that defense counsel agreed that Ronald Moody could legitimately assert his Fifth Amendment privilege and refuse to testify.
 {¶ 37} The court may exclude a witness called by the defense if that witness is being called solely for the purpose of having that witness invoke his Fifth Amendment privilege against self-incrimination in the presence of the jury. State v. Kirk (1995), 72 Ohio St.3d 564, paragraph one of the syllabus. However, under such circumstances, the defense is entitled to request an instruction that the jury should draw no inference from the absence of the witness because the witness was not available. Id., paragraph two of the syllabus.
 {¶ 38} Although we conclude that the trial court improperly failed to determine whether Ronald Moody possessed a legitimate right to assert the Fifth Amendment privilege against self-incrimination, we are precluded from finding error because it appears that defense counsel failed to object and may have invited such error out of a legitimate concern that, if compelled to testify, Ronald Moody might harm his client's defense. Appellant has failed to demonstrate prejudice from the trial court's ruling. The first assignment of error is not well-taken and is overruled.
 {¶ 39} In his second assignment of error, appellant contends the prosecutor engaged in prosecutorial misconduct.
 {¶ 40} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether the remarks prejudicially affected the accused's substantial rights. State v. Twyford,94 Ohio St.3d 340, 354-355, 2002-Ohio-894. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." Id., quoting Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940. In analyzing whether an appellant was deprived of a fair trial, an appellate court must determine whether absent the improper remarks, the jury would have found the appellant guilty. State v. Willard (2001), 144 Ohio App.3d 767, 773.
 {¶ 41} Here, appellant contends that he was deprived of a fair trial when the prosecutor improperly testified about matters not in evidence in an attempt to bolster the credibility of the prosecution's chief witness, Zachariah Brown. Specifically, appellant argues that, in rebuttal closing argument, the prosecution told the jury that Zachariah Brown's testimony was consistent with his testimony in the prior trial. The prosecutor stated:
 {¶ 42} "Now, you've heard a lot throughout this entire trial about another hearing, and you see Mr. Porter on cross-examination of witnesses, question witnesses using the transcript from that other hearing. But not once did the defense ever question [Brown] as to his statement as to these, this other hearing. Because he told the same story at the other hearing that he told now, and there was no discrepancy.
 {¶ 43} "MR. PORTER: Objection, Your Honor.
 {¶ 44} "THE COURT: Overruled." (Jan. 30, 2002 Tr., at 310.)
 {¶ 45} The prosecutor's comment to the jurors that Zachariah Brown told the same story at the other hearing and there was no discrepancy, was personal testimony by the assistant prosecutor. The statement was an improper attempt to bolster the credibility of a key prosecution witness, the only witness who stated he actually saw appellant shoot Khadaffi Johnson. The trial court erroneously overruled the objection and thus gave "the prosecutor's comment its approval in the jury's eyes." State v. Freeman (2000), 138 Ohio App.3d 408, 423, quoting State v. Keenan (1993), 66 Ohio St.3d 402, 410. While we find the statement was improper, prosecutorial misconduct is not reversible unless it was so prejudicial as to deny appellant a fair trial. Thus, we must consider whether this statement substantially prejudiced appellant.
 {¶ 46} There is no question that Zachariah Brown was a key prosecution witness. During the trial, the defense attacked his credibility by means of a taped interview he gave to police in which he never indicated that the man on the porch was the one who shot Khadaffi Johnson. Also, contrary to the state's assertion in rebuttal closing argument, appellant's counsel did ask Brown about testimony he gave in the earlier hearing. The defense questioned Brown about his earlier testimony concerning the presence of a person known as "Rip" who was with Brown that day. Apparently Brown also mentioned "Rip" in his taped statement. After listening to the tape, Brown admitted that the tape indicated "Rip" was with him that day and that he never indicated that the man on the porch was the person who shot Khadaffi Johnson.
 {¶ 47} Nevertheless, as we stated in our earlier opinion, in both trials the state proceeded under a theory that appellant and his brother were acting in concert with the same purpose when they obtained the guns, shot the guns, and got rid of the guns. Under a theory of aiding and abetting, the jury could have inferred criminal intent to assist his brother in killing Johnson and causing serious harm to Newbern from appellant's conduct before, during, and after the shooting. Appellant accepted the gun given to him by his brother Ronald. According to Judith Johnson, appellant aimed and deliberately fired his gun into the group of youths gathered in front of his house. Whether any of the bullets from appellant's gun actually struck the victims was a question of fact turning largely on the credibility of Zachariah Brown. If the jury believed Johnson and Brown, appellant took an active role in the offenses and did not merely acquiesce or witness the shooting of the victims. If the jury found Judith Johnson to be a credible witness, appellant's deliberate act of aiming and firing his gun into the group of youths was an overt act intended to assist his brother. If the jury believed Zachariah Brown's testimony that appellant actually shot Khadaffi Johnson as he was running away, then appellant could have been found guilty as a principal offender on the murder count. Thus, appellant could have been found guilty under all counts if the jury simply believed Judith Johnson that the brothers were taking aim, picking out specific targets, and firing into the group of youths.
 {¶ 48} In addition, the jury heard that immediately after the shooting, appellant stated that he had shot someone. The jury also heard appellant's statement to the news media, which he explained as part of a plan to help his brother. In sum, although the evidence of appellant's guilt was not overwhelming, we believe that in the context of the trial as a whole, there was ample evidence of appellant's guilt, particularly under a theory of aiding and abetting, and the prosecution's statement that Zachariah Brown's testimony was consistent with his earlier testimony was not so prejudicial as to deprive appellant of a fair trial.
 {¶ 49} Appellant also claims the prosecution attacked the credibility of the testimony of Paul Holder by making an assertion that was not supported by the record. On cross-examination, the prosecutor had elicited from Holder the admission that he had been convicted in New York for giving false reports. In his rebuttal closing, the prosecutor stated, "[t]hat's a felony." (Jan. 30, 2002 Tr., at 313.) There was no evidence in the record whether Holder's conviction in New York was a felony. Holder admitted to three other convictions for drug abuse, assaulting a police officer, and possession of weapons and admitted those convictions were for felonies, but he did not affirmatively state that the conviction for giving a false report was a felony.
 {¶ 50} We do not find substantial prejudice in this remark by the prosecutor because regardless of whether the conviction was for a felony or a misdemeanor, the essence of the comment was that Holder had been convicted of a crime of dishonesty, and the jury was entitled to consider that fact as bearing on the witness's credibility.
 {¶ 51} Finally, appellant contends the prosecution unfairly took advantage of the trial court's ruling concerning the availability of Ronald Moody to specifically point out that the only evidence relating to self-defense came from appellant, not Ronald Moody. As discussed above, the defense was entitled to a jury instruction that the jury was to draw no inference from the absence of a witness who was unavailable. Kirk, paragraph two of the syllabus. The defense did not request such an instruction. Furthermore, the prosecutor's statement was within the boundaries of legitimate argument concerning the weakness of the affirmative defense of self-defense. Accordingly, appellant's second assignment of error is not well-taken and is overruled.
 {¶ 52} Based on the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
TYACK and BROWN, JJ., concur.