[Cite as *State v. Junod*, 2009-Ohio-2817.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO.  2-09-03

    v.

DALE A. JUNOD,                         **O P I N I O N**

    DEFENDANT-APPELLANT.

**Appeal from Auglaize County Municipal Court**
**Trial Court No. 08-CRB-279**

**Judgment Affirmed**

**Date of Decision:   June 15, 2009**

APPEARANCES:

    *John A. Poppe*  for Appellant

    *Darren L. Meade*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Dale Junod, appeals the judgment of the Auglaize County Municipal Court convicting him of assault, sentencing him to a seven-day jail term, and imposing a community control sanction. On appeal, Junod argues that he was denied his constitutional right to a fair trial and due process of law by reason of prosecutorial misconduct, and that the jury verdict was against the manifest weight of the evidence. Based on the following, we affirm the judgment of the trial court.

{¶2} In April 2008, Junod was arrested and charged by complaint with one count of assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree; one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(1), a misdemeanor of the first degree; and, one count of menacing in violation of R.C. 2903.22(A), a misdemeanor of the fourth degree. The charges arose from an incident whereby Junod attacked his neighbor, Adrian Clark, with a walking cane and then threatened him after he thought Adrian stole $200 from his home. Subsequently, Junod entered a plea of not guilty to all charges, and the trial court released Junod upon a personal recognizance bond, requiring him, among other things, to have no contact with Adrian.

{¶3} In October 2008, the State filed a motion to revoke Junod's bond, stating that Junod "flipped Adrian the finger, yelled some profanity, and then

threw something at [his] vehicle" while Adrian drove past Junod's house on his way home one day. (Oct. 2008 Motion to Revoke Bond, p. 3). Subsequently, Junod was arrested and charged with one count of vehicular vandalism in violation of R.C. 2909.09(B)(1), a misdemeanor of the first degree.[1]

{¶4} In November 2008, the case proceeded to a jury trial, at which Adrian testified that, on April 16, 2008, he went to Junod's house to help him tear down an old building on his property; that, while helping Junod, he consumed around twelve beers; that Junod also drank beers with him, but he could not remember how many Junod consumed; that, after working with Junod, he went home and had an argument with his wife, Leah Clark, who was upset because he was intoxicated; that the police were called to his house because of the argument, and they decided to take him back to Junod's house because they were concerned that he might get violent with Leah; that, when he arrived at Junod's house, Junod told him to go inside and sit down; that while he was there, he consumed another beer and took a couple pills he believed to be Valium or Xanax, given to him by Junod, and Junod drank wine, smoked marijuana, and also took pills that he believed to be Valium or Xanax; that Junod's nephew, Travis, was also at the house; that, after some time, he called Leah and asked her to meet him at their

---

[1] We note that the trial court consolidated the April 2008 case with the October 2008 case for trial. However, only the April 2008 case is the subject of this appeal. Accordingly, we will only address the arguments that relate to the April 2008 case.

neighbor Bob Harruff's home; that, when he arrived at Harruff's, two other individuals by the name of Mark Potter and Chrissy Miller were there drinking and playing cards; that he was sitting in the living room talking to his wife and watching television when Junod knocked on the door, came into the house, and starting hitting him with a wooden cane; that he tried to shield the blows with his arm as Junod proceeded to strike him in the eye, the leg, the ribs, the shoulder, and the back of his neck; that, as Junod was hitting him, he accused him of taking his "stash" (trial tr., vol. 1, p. 29), and stated that some of his pills were missing; that Mark and Chrissy pushed Junod away and asked him to leave; that, as Junod was outside, he yelled at him to "come out and * * * finish this" (Id. at 31); and, that Junod also stated that he owed him $200 by tomorrow, and that if he or his family came to his house, they would be shot.

{¶5} Adrian continued that he did not take Junod's "stash"; that he could see Junod's truck outside the house before he left, and he saw the cane Junod used to beat him and another cane sitting in the front seat of his truck; that the cane he saw in the front seat of Junod's truck was the same cane that hung in Junod's house that Junod had shown him before, which contained a concealed blade; that, during the altercation, he did not try to hit or kick Junod, or try to pull a knife on him; that he owns a small pocket knife and a Gerber knife which he keeps in his tackle box, but that he does not own a "quick draw" knife; and, that, although he

was intoxicated at the time of the altercation, he still remembers the facts very clearly. Subsequently, Adrian identified several photographs depicting various bruises and red marks on his body sustained as the result of the beating, including marks on his shoulder, ribs, thigh, and hand.

{¶6} Leah testified that, on April 16, 2008, Adrian came home from Junod's house intoxicated; that an argument ensued during which the police were called to the house; that, when the police arrived, they decided to take Adrian back over to Junod's house in order to allow her and Adrian to calm down, despite the fact that she requested that Adrian not be taken to Junod's house; that, later in the evening, she agreed to meet Adrian at Bob Harruff's house to resolve their argument; that, as they were talking in Harruff's living room, Junod knocked on the door, came into the house, and began hitting Adrian with a cane and accusing him of stealing his "stash"; that both Adrian and Junod were visibly intoxicated during the altercation; that Junod hit Adrian about five or six times with the cane; that Adrian attempted to block the cane with his hands, but he did not attempt to strike Junod or pull out a knife; that when Junod left, he told Adrian that he owed him $200; that, as a result of the altercation, Adrian had a cut above his eye and bruises on his thigh and right leg; that she did not know what Junod meant when he referred to his "stash"; that she had seen Junod smoke marijuana on prior

occasions; and, that Adrian carries a small pocket knife, but she did not see it on the night of the altercation.

{¶7} Harruff testified that, on April 16, 2008, he was at home drinking with his friends, Mark and Chrissy, while Adrian and Leah were in the living room; that he had around eighteen beers that night; that, subsequently, Junod knocked on the door, he answered it, and Junod asked if Adrian was at the house; that he then let Junod into the living room, Junod said something to Adrian, and Junod began hitting Adrian with a cane; that Adrian attempted to block the strikes but did not attack Junod; that, although he could not fully see Adrian's right hand, he did not see him pull out a knife; that, eventually, Mark was able to get Junod outside; and, that Adrian went to the kitchen after the altercation, and not outside or to the door.

{¶8} Sergeant Douglas Burke from the Auglaize County Sherriff's Office testified that, on April 16, 2008, he was dispatched to speak with Junod about an assault that had taken place; that he and other police officers developed a plan to make contact with Junod because he had been told by the other officers who responded to the scene of the altercation that Junod threatened to "take out" anyone who came onto his property (Id. at 157-158); that he knocked on Junod's door, but he did not answer; that he looked inside the house to see if he could see anyone, and he noticed a wooden cane in the corner of the living room; that,

eventually, he was able to gain access to the house through an unlocked door; that, when he entered the house, Junod was asleep on the couch; that he awoke Junod and told him he was from the sheriff's office; that, as Junod awoke, he stated, "I did mean to hurt him. There's a difference between a swing and a swing" (Id. at 161); that he had encountered Junod intoxicated on previous occasions, and he noticed that Junod was intoxicated when he awoke; that, subsequently, Junod was arrested and questioned by Deputy Ahlers outside in his police cruiser; that Junod never mentioned that Adrian drew a knife on him, that Adrian attacked him, or that he used the cane to defend himself; and, that, although Adrian stated that there were drugs in Junod's house, he did not see any drugs.

{¶9} Deputy Ryan Ahlers from the Auglaize County Sheriff's Office testified that he and other deputies responded to the Harruff residence to investigate a call about an assault that had taken place; that, upon responding to the residence, he spoke with Adrian, Leah, and Chrissy, and was told that Adrian was attacked by Junod with a cane as Adrian was sitting in the recliner in the living room of the Harruff residence; that Adrian complained of pain from being attacked, including being hit in the leg, testicle, and chest; that he subsequently took photographs of the bruises and marks on Adrian's body; that Adrian was intoxicated but coherent when he spoke to him; and, that Adrian stated he felt

threatened from Junod's statements that he owed him $200, and that if anybody went to his residence "he would take them out." (Trial Tr., vol. 2, p. 203).

{¶10} Deputy Ahlers continued that he and the other deputies went to Junod's house to contact him; that, after unsuccessful attempts to get Junod to open the door, he and the other deputies entered the house and woke Junod up; that, while he was in the house, he observed two canes in the corner of a room; that the deputies confiscated both canes; that, after Junod was arrested and read his Miranda rights, Junod agreed to speak with him; that Junod was intoxicated but coherent during the questioning; that, during the questioning, Junod stated that he went to the Harruff residence to confront Adrian about money that Adrian stole from him, and that he lost control while he was there; that Junod never mentioned that Adrian attacked him with a knife, that he was defending himself from Adrian, that Adrian ever struck him, or that Adrian had stolen his "stash"; that he did not search Adrian to see if he had any money, but Adrian stated that he did not take anything from Junod and voluntarily went into his pockets to show that he did not have anything in them; that he did not notice any large wads of money or pills in Adrian's pockets; that he took the two confiscated canes to Adrian, and he identified a wooden cane as one Junod used to assault him, and a metal cane as the one that he saw in the truck; and, that Adrian had never mentioned anything to him prior to that identification about a metal cane.

{¶11} At the close of the State's case-in-chief, Junod's trial counsel made a Crim.R. 29 motion for judgment of acquittal on all counts.[2] The trial court granted the motion with respect to the concealed weapon count.

{¶12} Subsequently, Junod testified that, on April 16, 2008, he and his nephew Travis Junod were tearing down a shed on his property when Adrian arrived and asked if there was anything he could do to make some extra money; that he told Adrian he could help him tear down the shed; that Adrian began helping them, and all three drank while they worked; that he had around four beers, and Adrian had around twelve beers; that Adrian left after working and went home; that, subsequently, he received a phone call from a deputy sheriff asking if he could bring Adrian over to his house to "sober[] up" (Id. at 332), to which he agreed; that, when Adrian arrived at his house, he told him to sit on a chair on the porch, and he went back to tearing down the shed; that he told Travis to "try to settle [Adrian] down because he was talking out of his mind" (Id. at 333); that, after some time, Travis came back and told him that Adrian was sitting in the house; that he went back into the house because he did not want Adrian in there by himself, and he saw Adrian walking into walls and knocking over things in the house; and, that he then told Adrian that he needed to leave.

---

[2] We note that the transcript reveals that Junod's trial counsel actually moved for a directed verdict at the close of the State's case-in-chief; however, the trial court correctly construed his directed verdict motion as a motion for judgment of acquittal pursuant to Crim.R. 29(A). A motion for a directed verdict is appropriate only in a civil case under Civ.R. 50(A).

{¶13} Junod continued that, after Adrian left, he decided to verify that the money he kept in his checkbook was still there; that he kept his checkbook behind his rocking chair with other paperwork; that, when he looked in his checkbook, $200 was missing; that he went over to the Harruff residence to confront Adrian about the missing money and took his cane with him, as he needed it to assist him in walking due to his back pain; that, when he went in the residence, he asked Adrian about the missing money, and Adrian told him that Travis took it; that he and Adrian continued to argue about the missing money, and he told Adrian that he should bring it to him tomorrow; that he then looked down at Adrian's right hand and saw it go into his pocket and pull out a pocket knife with the blade drawn; that he then took his cane and began beating Adrian's hand containing the knife in order to protect himself; that Adrian never threatened him, lunged toward him, or tried to kick him, but that he tried to swing at him with his left hand; that he stopped hitting Adrian after he could no longer see a knife in his hand; that he then proceeded to walk out of the house and asked Adrian if he wanted to come outside "so [they] could talk about it or * * * fight about it" (Id. at 347); that Adrian never came outside, so he drove back home; that, when he got home, he drank about half a bottle of wine and a few beers, and fell asleep on the couch; that he awoke surrounded by several deputies who asked him a few questions and then arrested him; that he spoke with one of the deputies, but he never mentioned to the

deputy that Adrian drew a knife on him or that he hit Adrian in self-defense; that he decided he should not tell the police about Adrian's knife or his self-defense claim until he talked to his lawyer; and, that he did tell the deputy that he lost control when he went to confront Adrian, that he should not have confronted Adrian because he was very angry, and that he challenged Adrian to come outside and "finish it." (Id. at 389).

{¶14} Junod further testified that when he first arrived at the Harruff residence, he saw Mark Potter, Chrissy Miller, and Bob Harruff "rolling joints" (Id. at 345); that he did not see Leah in the house; that when Adrian drew the knife, he feared that he might stab him, as Adrian had previously told him stories about how he stabbed other inmates when he was in prison, and he had seen Adrian do a "quick draw" with his knife (Id. at 393); that he never threatened Adrian in any way during the altercation; that Adrian's testimony that he was smoking marijuana while Adrian was at his house was not true; that he never attempted to contact the police about the money that he believed Adrian had stolen; and, that he only took the wooden cane with him when he went to confront Adrian, leaving the metal one at home.

{¶15} Travis testified that, on April 16, 2008, he was at Junod's house helping him tear down a shed; that, while they were working, a deputy sheriff dropped Adrian off at the house; that Junod left him to work by himself while he

watched Adrian; that, after about twenty minutes, Junod returned and asked him to go speak with Adrian because "[Junod] couldn't do anything with him" (trial tr., vol. 3, p. 432); that he went into the house and saw Adrian sitting on a bar stool; that Adrian was acting erratic and complaining about his family and lack of employment; that, after talking with Adrian, he left; that he was aware of Adrian's skill in "quick drawing" a knife and had seen him demonstrate the skill on prior occasions; and, that he knew Junod kept money in his checkbook, but he did not take the money.

{¶16} Subsequently, the jury convicted Junod of assault and acquitted him of menacing and vehicular vandalism. The trial court filed a journal entry stating, in part:

> **These cases proceeded to jury trial on charges of Assault R.C, [sic] 2903.12 A1, Carrying a concealed weapon R.C, [sic] 2923.12 A1, and Menacing R.C. 2903.22 A in Case 2008 CRB 00279. The case also proceeded to jury trial on the charge of Vehicular Vandalism R.C. 2909.09 in case 2008 CRB 281.**
>
> **At the close of the State's case the Court dismissed the charge of Carrying a Concealed Weapon holding that the weapon by its very nature was not a concealed weapon.**
>
> **The remaining counts were presented to the jury which returned a verdict of guilty as to the charge of assault and verdicts of not guilty as to the remaining charges of Menacing and Vehicular Vandalism.**

(Nov. 2008 Journal Entry).

{¶17} In December 2008, the trial court sentenced Junod to a seven-day jail term and imposed a community control sanction through January 2011. The trial court filed a judgment entry which memorialized the sentence and stated that Junod was convicted of assault in violation of R.C. 2903.12(A)(1).

{¶18} In January 2009, the trial court filed a judgment entry correcting the November 2008 entry, stating that Junod was convicted of assault under R.C. 2903.13(A)(1) and not R.C. 2903.12(A)(1). However, the judgment entry did not correct the misstated section number from the December 2008 judgment.

{¶19} It is from his assault conviction and sentence that Junod appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW WERE TAKEN AWAY BY PROSECUTORIAL MISCONDUCT.**

*Assignment of Error No. II*

**THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶20} Before addressing Junod's assignments of error, we first note that the trial court failed to correct the December 2008 judgment entry to accurately reflect the proper section of the Revised Code of which Junod was convicted. Although the trial court filed an order correcting the November 2008 judgment entry, the December 2008 entry is the judgment entry from which Junod appeals,

as it lists both his conviction and sentence. See *State v. Baker*, 119 Ohio St.3d 197, 201, 2008-Ohio-3330 (judgment entry must contain both a sentence and means of conviction to be a final appealable order under R.C. 2505.02). It is clear that the trial court was aware of the proper Revised Code section of which Junod was convicted, as it corrected the same mistake in the November 2008 entry; however, due to an obvious oversight, the trial court failed to make the correction to the December 2008 judgment. Accordingly, we find this oversight to be a mere clerical error, which will allow the trial court to file a nunc pro tunc entry that lists the proper Revised Code section of which Junod was convicted. See Crim.R. 36; *State v. Yeaples*, 3d Dist. No. 13-08-14, 2009-Ohio-184, ¶15, citing *State ex rel. Cruzado v. Zaleski,* 111 Ohio St.3d 353, 356, 2006-Ohio-5795; *Gold Touch, Inc. v. TJS Lab, Inc.* (1998), 130 Ohio App.3d 106, 109.

*Assignment of Error No. I*

{¶21} In his first assignment of error, Junod argues that he was denied his constitutional rights to a fair trial and due process of law as a result of prosecutorial misconduct. Specifically, Junod contends that he was denied a fair trial and due process of law when the State continued to ask leading questions on direct examination despite admonition from the trial court; when the State was permitted to present evidence on his prior intoxication in the presence of sheriff's deputies; when the trial court allowed the admission of prejudicial hearsay

testimony elicited by the State; and, when the State charged him with multiple offenses without sufficient evidence to prove his guilt in order to coerce him into accepting a plea bargain. We disagree.

{¶22} "'[T]he test for prosecutorial misconduct is whether the [conduct was] improper and, if so, whether the [conduct] prejudicially affected the accused's substantial rights.'" *State v. Crisp*, 3d Dist. No. 1-05-45, 2006-Ohio-2509, ¶10, quoting *State v. Twyford*, 94 Ohio St.3d 340, 354-55, 2002-Ohio-894. Consequently, in order to grant a new trial for prosecutorial misconduct, we must not merely find the acts of the prosecutor to be culpable, but we must find that the acts detrimentally affected the fairness of the proceedings. *Twyford*, 94 Ohio St.3d at 355, citing *Smith v. Phillips* (1982), 455 U.S. 209, 219.

{¶23} First, Junod asserts that the State's use of leading questions constituted prosecutorial misconduct and prejudiced his right to a fair trial. There were several instances throughout the trial where the State asked leading questions to its witnesses on direct examination, including asking Adrian if the police were called to his house due to his argument with his wife, how he and his wife decided to resolve their disagreement, and asking about Junod's threat to him as Junod left the Harruff residence. In all three of these instances, Junod's trial counsel objected, and the trial court sustained the objection. Even though the use of leading questions is not generally permitted on direct examination pursuant to

Evid.R. 611(C), the questions about the police being called to Adrian's house and how he and his wife resolved their disagreement are merely foundational questions. Moreover, Junod himself testified to asking Adrian to come outside and fight. As such, we do not find that these leading questions amounted to prosecutorial misconduct or affected the fairness of the proceedings.

{¶24} Secondly, Junod asserts that prejudicial prosecutorial misconduct occurred due to the State's introduction of evidence on his prior intoxication in the presence of sheriff's deputies. At trial, the State questioned Sergeant Burke about Junod's condition when they went into his home to question him. Burke testified that Junod appeared to be intoxicated, and the State asked Burke whether he had previously observed Junod intoxicated, to which Burke responded that he had observed Junod intoxicated on prior occasions. Junod's trial counsel objected on the grounds that the evidence was not relevant, but the trial court overruled the objection after the State's explanation that the purpose of the evidence was to bolster the officer's assessment of Junod's intoxication based on his prior contact and experience with Junod. The trial court gave Junod's trial counsel the opportunity to stipulate that Junod was intoxicated that evening to prevent the testimony from being introduced, but his trial counsel refused.

{¶25} Evid.R. 404(B) provides that evidence of other crimes, wrongs, or acts is inadmissible to prove the character of a person in order to show conformity

therewith, unless it is offered for some other purpose. See, also, *State v. Rogers*, 3d Dist. No. 9-95-50, 1996 WL 197410. Furthermore, Evid.R. 402 provides that, unless an exception applies, all relevant evidence is admissible. See, also, *State v. Hines*, 3d Dist. No. 9-05-13, 2005-Ohio-6696, ¶28. Here, the State offered the testimony of Junod's prior intoxication for the relevant purpose of bolstering the credibility of Sergeant Burke's assessment that Junod was intoxicated that evening, and not for the improper purpose of demonstrating that Junod had a drinking problem in order to assert that he might also have had difficulty controlling his anger, which led to the assault. Additionally, Junod declined the opportunity to stipulate to the intoxication so this testimony would not be admitted. Consequently, we find there to be no prosecutorial misconduct in eliciting Sergeant Burke's testimony, let alone conduct that might prejudice the proceeding.

**{¶26}** Third, Junod contends that prosecutorial misconduct deprived him of a fair trial when the state introduced hearsay testimony through the statements of Deputy Ahlers that Adrian told him that he felt threatened by Junod when Junod told Adrian that "he better have the $200 by tomorrow morning" and that "if anybody went to his residence * * * he would take them out." (Trial tr., vol. 2, p. 202-203). Junod's trial counsel properly objected to the testimony, but the trial court overruled the objection and permitted the testimony.

**{¶27}** All hearsay is inadmissible unless if falls into one of the specified exceptions under the rules of evidence, Evid.R. 802; *State v. Brooks*, 3d Dist. No. 4-08-09, 2008-Ohio-6188, ¶5, and, when a hearsay statement is included within a hearsay statement, each statement must conform to an exception of the hearsay rules to be admissible. Evid.R. 805. Evid. R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Additionally, Evid.R. 801(D)(2)(a) provides that a statement is not hearsay if it is offered against a party and is the party's own statement. See, also, *State v. Newcomb*, 3d Dist. No. 8-01-07, 2001-Ohio-2325.

**{¶28}** Here, Adrian's statement to Deputy Ahlers was Junod's own statement being offered against him, and, therefore, the statement was admissible under Evid.R. 801(D)(2)(a). Furthermore, Deputy Ahler's account of Adrian's statement was not offered to prove the truth of the matter asserted, but was offered to show that the statement caused Adrian to believe that Junod would cause him physical harm, one of the elements of menacing under R.C. 2903.22(A). Accordingly, because the prosecutor's elicitation of testimony was proper under the hearsay rules, we find that this conduct does not amount to prosecutorial misconduct.

Case No. 2-09-03

**{¶29}** Finally, Junod contends that prosecutorial misconduct denied him his right to a fair trial when the State charged him with multiple offenses with insufficient evidence to prove those offenses in order to persuade him to take a plea bargain. Here, Junod was charged with one count each of assault, carrying a concealed weapon, and menacing.[3] These offenses are defined as follows:

Assault:

**No person shall knowingly cause or attempt to cause physical harm to another \* \* \*.**

R.C. 2903.13(A).

Carrying a Concealed Weapon:

**(A)  No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following:**
**(1)  A deadly weapon other than a handgun**

R.C. 2923.12(A)(1).

Menacing:

**No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person, \* \* \* or a member of the other person's immediate family.**

R.C. 2903.22(A).

**{¶30}** Here, testimony was presented by Adrian that Junod struck him with

---

[3] Although Junod was also charged with vehicular vandalism under R.C. 2909.09(B)(1), that charge is not the subject of this appeal, as noted in footnote one.

a cane multiple times, told Adrian in a threatening manner that he needed to give him $200 by the following day, threatened to shoot him or his family members if they came onto his property, and brought a cane containing a concealed knife when he came to confront him. Although the trial court dismissed the concealed weapon charge, and the jury found Junod not guilty on the menacing charge, we find that sufficient evidence existed to for the State to charge Junod with these offenses. Consequently, we find no prosecutorial misconduct in charging Junod with multiple offenses, let alone the necessary prejudice to warrant a new trial.

{¶31} Because we find there to be no prosecutorial misconduct in the State's use of leading questions, the State's elicitation of testimony, or the State's decision to charge Junod with multiple offenses, we also find to be without merit Junod's argument that this conduct denied him his right to a fair trial.

{¶32} Accordingly, we overrule Junod's first assignment of error.

*Assignment of Error No. II*

{¶33} In his second assignment of error, Junod argues that his conviction is against the manifest weight of the evidence. Specifically, he contends that the evidence supports a finding that he sustained his burden of proof on his self-defense claim, and, consequently, that he should have been acquitted of the assault charge. We disagree.

{¶34} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Tompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by constitutional amendment on other grounds as stated by *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-335, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶35} In reviewing the testimony presented at trial, we find there to be substantial evidence to support Junod's assault conviction. Not only did Adrian testify to the details of Junod's assault on him, including that he did not draw a knife or threaten Junod, but Leah also testified to the same details of the assault, also stating that Adrian did not pull out a knife to threaten Junod. Although Adrian and Leah are husband and wife, and, as such, could have a motive to fabricate and corroborate their testimony, such a scenario seems unlikely, as their testimony was also supported by Harruff, who testified that Junod hit Adrian with a cane multiple times, and that he did not see Adrian draw a knife on Junod.

{¶36} Furthermore, Junod's assault conviction is supported by the testimony of Sergeant Burke and Deputy Ahlers. Sergeant Burke testified that Junod told him that he meant to hurt Adrian, and that Junod never mentioned to him that Adrian drew a knife on him, or that he assaulted Adrian in self-defense. Also, Deputy Ahlers testified that Junod never mentioned during the interrogation that Adrian drew a knife on him, or that his assault of Adrian was in self-defense.

{¶37} In support of his defense, the only evidence presented by Junod that his assault on Adrian was in self-defense was his own testimony that Adrian drew a knife on him when he confronted Adrian about the missing $200. While Junod and Travis both testified to Adrian's "quick drawing" skills, and Junod testified to Adrian's propensity for violence, there was no other evidence presented to corroborate Junod's testimony that the assault was in self-defense, in spite of the fact that four other individuals witnessed the altercation.

{¶38} Accordingly, we overrule Junod's second assignment of error.

{¶39} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**